STATE OF NEBRASKA, APPELLEE, V. JUDSON SACK, APPELLANT.
477 N.W.2d 921

Filed December 20, 1991.    No. 90-747.

John R. Brogan for appellant.

Don Stenberg, Attorney General, and Mark D. Starr for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ.

CAPORALE, J.

In accordance with his plea, defendant-appellant, Judson Sack, was adjudged guilty of second degree forgery, in violation of Neb. Rev. Stat. § 28-603 (Reissue 1989). He was thereafter sentenced to imprisonment for a period of not less than 6 nor more than 20 years. On appeal, he asserts the trial judge erred in, among other things, permitting the withdrawal of court-appointed counsel without appointing another and in finding the subsequent guilty plea to have been entered freely, voluntarily, and understandingly. Those claims being meritorious, we reverse, and remand the cause for further proceedings.

Prior to his arrest, Sack had lived in York at an apartment contained in a building owned by his grandfather, in which building the grandfather occupied a separate apartment. The relationship between the two had become strained even before Sack, on or about September 15, 1989, took the grandfather's automobile and, without the latter's consent, drove it to Lincoln, where he damaged it in an accident. According to the prosecutor, when Sack admitted to his grandfather the following day that he had taken the automobile, the grandfather told Sack to move out of his apartment. Sack, however, denies that the grandfather ordered him to leave.

On September 21, 1989, Sack, accompanied by two friends, Katrina Jackson and Erik Meyle, drove from Lincoln to York, arriving at around midnight. The three first went to the grandfather's apartment building, where they stayed for a few minutes before leaving to visit Jackson's aunt. After approximately an hour to an hour and a half, the three returned to Sack's former apartment, where Meyle and Jackson slept. When they awoke at 9 a.m. on September 22, 1989, they found that Sack's suitcase and belongings had been transferred to his grandfather's apartment.

Sack reported to York police officer Kim Christensen that he went to his grandfather's apartment around 7:30 on the morning of September 22, saw that the newspaper was gone from in front of the door, tried the door, and, finding it unlocked, let himself in. However, Berry Redfern, an employee of the York State Bank, where the grandfather served as board

chairman, told Christensen that Gloria Stett, a housekeeper who lived in the building and also worked at the bank, said Sack asked her to let him into the grandfather's apartment, but she would not open the door. Sack, on a different occasion, also told Christensen that during the evening of September 21, Stett had let Sack into his former apartment. Consequently, it is unclear how Sack got into either his former apartment or his grandfather's.

In any event, at some time on September 22, Sack invited Meyle and Jackson to his grandfather's apartment, where they ate and watched television and where Jackson took a shower. At approximately 10:30 a.m., the grandfather and Redfern arrived, and after an exchange of words between the grandfather and Sack, the three were ordered out. Shortly thereafter, the police were notified of the incident.

After leaving the grandfather's apartment, Sack, Jackson, and Meyle traveled to Bradshaw, Nebraska, where Sack used a $100 bill to buy lunch for everyone. They then returned to York and went to a branch of the York bank, where Sack attempted to cash a check purportedly written by the grandfather to Sack in the sum of $3,700. The teller, being concerned about the large amount of the check, called the main office of the bank and talked to John Strong. Strong in turn contacted the grandfather, who stated that the check was forged and that Sack should be sent to the main office. Instead of going to the main office, however, Sack went to another branch office. That branch had already been warned by Strong that Sack might try to cash a check there, and, thus, when Sack presented the check, the teller contacted Strong. Sensing trouble, Sack attempted to get the check back, but was arrested shortly thereafter.

The grandfather later indicated that the $100 bill and the blank check, which was then completed by Sack, had been taken from the pocket of a coat which had been at the grandfather's apartment. The grandfather estimated that the money and check were taken sometime between 10:30 p.m. September 21, 1989, and 8 a.m. the following day.

On September 29, James Truell was appointed counsel for Sack because of the latter's indigent status. On November 1,

Truell filed notice that Sack would assert an insanity defense. Truell represented Sack at the subsequent arraignment held on November 7 and at a hearing on a discovery motion on December 5. On January 19, 1990, Truell filed a motion for continuance because Sack was "currently undergoing private psychological evaluation . . . ." On February 1, 1990, Truell filed a motion to withdraw, asserting Sack had been uncooperative and dissatisfied with the representation he was receiving and had expressly discharged Truell. At the February 13, 1990, hearing on that motion, Truell stated Sack felt that "the communication between us and the nature of my representation has been insufficient or does not meet his standards." Sack, however, stated he was not asking Truell to withdraw because of his incompetence but, rather, because

> I would like an opportunity to seek counsel on my own. I don't think that — Well, actually I have — I have a list prepared. I don't intend to make a show out of it. I just feel that there's been a number of issues that I'm concerned about and would like an opportunity to obtain counsel on my own. If unable to do that then I would — I would appreciate an opportunity to have someone else appointed.

The trial judge stated that Truell was a competent attorney whose abilities met the standard of the community and told Sack that "if I allow him to withdraw, then your only option would be to retain your own counsel. Because I will find that you elect to proceed pro se, that is without counsel, and will not make a substitute appointment." The trial judge then asked Sack if he still wanted Truell to withdraw. Sack responded that he wanted 7 days to "[f]ind out if I can obtain a counsel on my own. At that time I will know for sure. . . . [B]ut I think it might be a little imprudent to just let him go if — if there's going to be no other opportunity provided to seek court appointed." The trial judge then stated that if Sack believed Truell should be discharged, the employment of substitute counsel would not be a good reason for a continuance of the trial, scheduled for March 19, 1990. The trial judge concluded by saying that the matter would be continued for 7 days, "at which time if . . . Truell does not withdraw his motion to withdraw, then I will

grant his withdrawal and we will then proceed accordingly . . . ."

On March 2, 1990, long after the 7 days mentioned on February 13 had elapsed, the trial judge sustained Truell's motion to withdraw. In a communication filed March 13, 1990, Sack asked to see the trial judge about the "attorney issue" and requested the appointment of John Brogan as his attorney. The document went on to say that Sack, not wishing to run up a bill for his grandfather, would pay "full restitution for attorney fees."

On the scheduled trial date, March 19, 1990, a hearing was held on Sack's written motion for a continuance. Sack declared therein that he had no attorney and had no resources to employ one. In arguing the motion, however, he said that he had an attorney but that the attorney was booked up on the scheduled day of the trial and would represent Sack if a continuance were granted. Notwithstanding that Sack had been found indigent, had declared in his motion for continuance that he had no funds with which to employ counsel, and had earlier offered only to pay restitution of attorney fees, he now announced that if the court did not appoint Brogan, he would hire Brogan himself. Sack did not, however, advise the trial judge how he would manage this. The trial judge overruled Sack's motion for continuance and ordered the trial to proceed.

During the half-hour recess which followed, Sack and the prosecutor negotiated an agreement whereby Sack would plead guilty to forgery, and the State would dismiss the burglary charge it had lodged. The trial judge explained some rights of Sack and had Sack acknowledge he understood that by pleading guilty he would be waiving (1) the presumption that he is innocent, (2) the right to trial, (3) the right to subpoena witnesses, (4) the right to face his accusers, (5) the right to challenge any admissions, statements, or confessions as not being voluntarily given, and (6) the right to suppress evidence. Sack agreed to forfeit these rights, and confessed to committing forgery. Although the trial judge did not at this time discuss Sack's lack of counsel, he found

> beyond a reasonable doubt that [Sack] fully understands all of his statutory and constitutional rights, has made those — and waived those rights freely, voluntarily,

knowingly, and intelligently, fully understanding the nature of the charge and the consequences of his plea, which the Court specifically finds is made freely, voluntarily, knowingly and intelligently . . . .

The fundamental issue presented by the first summarized assignment of error, which challenges the district court's sustainment of appointed counsel's motion to withdraw, without appointing a replacement attorney, is whether the record demonstrates that Sack, either by words or by conduct, knowingly, intelligently, and voluntarily waived his right to counsel.

We begin our analysis by recalling that the burden is on the State to establish a valid waiver of an accused's sixth amendment right to counsel, *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986), and that every reasonable presumption against the waiver is indulged, *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991). A waiver must appear affirmatively from the record before a court may conclude that an accused has waived a constitutional or statutory right. *State v. Clear*, 236 Neb. 648, 463 N.W.2d 581 (1990).

Although an accused has the right to counsel, he or she also has a right under the sixth amendment, *State v. Green*, 236 Neb. 33, 458 N.W.2d 472 (1990), and Neb. Const. art. I, § 11, to conduct his or her own defense, *State v. Shepard, ante* p. 639, 477 N.W.2d 567 (1991). Thus, an accused may by express words waive the right to counsel, so long as such is done voluntarily, understandingly, and intelligently, and so long as the accused is able and willing to abide by the rules of procedure and courtroom protocol. *State v. Green*, 236 Neb. 33, 458 N.W.2d 472 (1990). See, also, *State v. Clark*, 216 Neb. 49, 342 N.W.2d 366 (1983). An accused may also waive the right to counsel by conduct. E.g., *State v. McCoy*, 228 Neb. 178, 421 N.W.2d 780 (1988) (accused's second request that appointed counsel be permitted to withdraw and protest of appointment of standby counsel waived right to counsel).

The facts in *State v. Moore*, 203 Neb. 94, 277 N.W.2d 554 (1979), are not unlike those now before us. Moore had been charged with refusing to submit to a blood, breath, or urine

test. He was arraigned and informed of his right to an attorney, but Moore told the trial court of his desire to retain his own attorney. Eight days before trial, Moore was arrested for violating parole. He testified that neither he nor his wife was successful in hiring an attorney. Moore appeared at trial without counsel, at which time the trial court inquired whether Moore had been informed of his right to counsel. Moore responded affirmatively. The trial court

> then asked whether [Moore] had talked to his lawyer and [Moore] responded: "I couldn't. I was in jail." The trial court then stated: "All right, but you knew you had a right to a lawyer.", and [Moore] responded: "Yes, yes, I knew." The [trial court] then announced that [it] would take judicial notice that the jail had a telephone and said: "Well, I guess you'll have to go on your own then . . . ."

*Id.* at 96, 277 N.W.2d at 556. Subsequently to being found guilty, Moore and his wife wrote several letters requesting counsel for the purpose of appeal. Not until 7½ weeks after the trial was Moore's indigency acknowledged and counsel appointed.

> Although [Moore] had already affirmatively indicated his intention to exercise his constitutional right to counsel by retaining private counsel, the [trial] court interpreted [Moore's] appearance at trial without counsel as an affirmative, intelligent, and understanding waiver of his constitutional right to counsel simply because [Moore] had been advised of his right to counsel a month before. Under the circumstances here it was wholly unreasonable to assume that [Moore] had conclusively rejected an offer of counsel, much less that he had affirmatively waived his right to counsel.

*Id.* at 99, 277 N.W.2d at 557.

*State v. Sondag,* 214 Neb. 659, 335 N.W.2d 306 (1983), is instructive as well. Sondag had appeared at several preliminary hearings with privately retained counsel. When Sondag failed to appear at the scheduled arraignment, the trial court issued a capias and took under advisement counsel's motion to withdraw. Privately retained counsel and Sondag then appeared at a rescheduled arraignment. The trial court

conducted the hearing and then permitted privately retained counsel to withdraw. It also informed Sondag of his right to court-appointed counsel. Sondag acknowledged his right but stated that he planned to hire his own attorney. " 'I don't want a public defender and I don't feel I know enough about the law to defend myself.' " *Id.* at 660, 335 N.W.2d at 307. The trial court proceeded to warn Sondag that the trial was set for March 1, 1982, and that it would not be continued should Sondag appear without counsel. On the day of the scheduled trial, Sondag arrived without counsel before a different judge, who reminded Sondag that he had been informed of his right to counsel and of the date of trial, and that despite his failure to secure counsel, the case was to proceed. The judge further noted that Sondag had declined the original invitation to have court-appointed counsel. Sondag responded: " '[B]ut at that time I assumed that I would—I was going to be able to afford an attorney. It was an improper assumption on my behalf.' " *Id.* at 661·, 335 N.W.2d at 307. Notwithstanding, the trial proceeded.

Relying on *Moore, supra,* we held that Sondag's mere intent to retain counsel and his ensuing appearance alone at the scheduled trial could not be interpreted as a waiver of ·his constitutional right to counsel.

Here, Sack made clear that while he was concerned about the quality of representation being provided by Truell, he did not desire to proceed without an attorney. After Truell was permitted to withdraw, Sack again indicated he wanted representation.

It is well settled that an indigent accused does not have the right to appointed counsel of his or her choice nor to be represented by an appointed attorney the accused likes or with whom the accused has rapport. See *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989). Once counsel has been appointed for an indigent accused, the accused must remain with the appointed counsel unless one of the following conditions is met: (1) The accused knowingly, voluntarily, and intelligently waives the right to counsel and chooses to proceed pro se, see *State v. McPhail*, 228 Neb. 117, 421 N.W.2d 443 (1988); (2) appointed counsel is incompetent, in which case new counsel is to be appointed, see *State v. Clark*, 216 Neb. 49, 342 N.W.2d 366

(1983); or (3) the accused chooses to retain private counsel, see *State v. Neal*, 231 Neb. 415, 436 N.W.2d 514 (1989). However, retaining private counsel does not compel the granting of a continuance. See *id.*

Sack said nothing nor took any action sufficient to satisfy any of these conditions to discharge his court-appointed counsel. He did not waive his right to counsel and elect to represent himself, nor did he unequivocally forfeit his then appointed counsel in pursuit of a private attorney. The trial court found that Truell was competent, and his motion to withdraw as appointed counsel should therefore have been overruled. Under the circumstances, Sack's statement that he did not wish to proceed pro se renders clearly wrong the trial court's finding that Sack freely, voluntarily, and understandingly waived his right to counsel.

A plea of guilty cannot be said to have been entered freely, intelligently, voluntarily, and understandingly unless the accused either was represented by counsel or freely, voluntarily, and understandingly waived the right thereto. See, *State v. Glover*, 236 Neb. 402, 461 N.W.2d 410 (1990); *State v. Irish*, 223 Neb. 814, 394 N.W.2d 879 (1986). It therefore necessarily follows that the trial court's finding that Sack's plea of guilty was entered freely, intelligently, voluntarily, and understandingly is likewise clearly wrong.

Accordingly, the judgment must be reversed and the cause remanded for further proceedings on both the forgery and burglary charges.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

GRANT, J., participating on briefs.