STATE OF NEBRASKA, APPELLEE, V.
MICHAEL E. MCLEMORE, APPELLANT.
623 N.W. 2d 315

Filed March 23, 2001. No. S-99-1323.

Karen A. Bates-Crouch for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

A jury convicted Michael E. McLemore of first degree murder and use of a deadly weapon to commit a felony in connection with the September 2, 1997, death of Marcella Lynn Estes-Torres (Torres). McLemore was sentenced to life in prison on the murder conviction and not less than nor more than 20 years' imprisonment for use of a weapon. McLemore appeals.

## FACTUAL BACKGROUND

Torres was a real estate agent who lived in Omaha with two of her children and her brother, Edward Mentzer. Torres was married, but the marriage was troubled. Torres' husband was incarcerated at the time of Torres' murder.

On July 25, 1997, Torres met McLemore, and the two began a dating relationship. Soon after the two met, McLemore developed strong feelings for Torres. However, by the end of August 1997, Torres had expressed a desire to end her relationship with McLemore.

On the afternoon of September 1, 1997, McLemore accompanied Torres to a real estate appointment. After the appointment had concluded, Torres dropped McLemore off at his apartment and told him she would return to his apartment around 7 p.m.

Corine Alvarado, one of Torres' older daughters, was babysitting Torres' two younger children at Torres' residence that afternoon and evening. Between 5 and 6 p.m., Torres returned to her home to get ready to go out for the evening. She told Alvarado that she was going to the Anchor Inn. When she left the house that evening, Torres was wearing blue jeans, a black belt, a white tank top, and white pumps.

Thereafter, Torres went to the residence of Frank Szeliga and his girl friend, Kerri Cullinane. Torres had previously dated Szeliga. Torres asked Szeliga and Cullinane if they would like to go with her to the Anchor Inn. Szeliga and Cullinane declined. Torres then picked up her friend Epifanio Barrientos, and he accompanied her to the Anchor Inn. Torres dropped Barrientos off at his residence at approximately 11 p.m.

McLemore waited until approximately 8 p.m. for Torres to arrive at his residence. Between 8 and 9 p.m., Alvarado received a telephone call from McLemore, asking where Torres was. Alvarado received two more calls from McLemore that evening, asking where Torres was and sounding angrier with each call.

Between 8 and 10 p.m., Mentzer, Torres' brother, returned to Torres' residence, and Alvarado informed him she would be leaving once the children were asleep. Mentzer then went to his downstairs bedroom and went to sleep at approximately 10:30 p.m.

McLemore's attempts to reach Torres having proved unsuccessful, McLemore decided to walk to her house, a distance of

5 miles. McLemore took a knife with him. Alvarado left Torres' residence at 12:04 a.m. on September 2, 1997. As she was leaving, she saw McLemore walking toward the residence with a bottle of beer in his hand. McLemore, wanting to make sure Alvarado was not coming back, waited outside Torres' residence for 20 minutes. He then entered Torres' residence and was inside the residence for approximately 20 minutes. During that time, McLemore was angry and began slicing up Torres' living room furniture with his knife and strewing the stuffing over the living room floor.

At 12:45 a.m. Torres' neighbors, Rodney and Joanne Givens, were awakened by a woman's screaming for help. Looking out their bedroom window, the Givenses saw a woman they recognized as Torres struggling with a man whom they did not recognize. Joanne Givens went to the kitchen and called the police. The Givenses then saw the man putting Torres into the passenger side of Torres' car and driving away. The Givenses' son Drew, who also witnessed the incident, heard a woman screaming for help and a man saying, "[H]ow could you do this to me, bitch?" When Drew looked out the window, he witnessed the man and woman struggling. All three of the Givenses noticed that the man was holding a shiny object which he eventually put behind his back, into his belt or pants. It was dark and raining at the time the Givenses witnessed this incident, and the Givenses gave varying physical descriptions of the male they saw struggling with Torres.

Louisa Smith, another of Torres' neighbors, was also awakened at 12:45 a.m. by a woman screaming for help. Upon looking out her window, Smith witnessed a man chasing a woman in the street, both falling to the ground, and the man putting the woman into a car and driving away. Smith could not identify either of the people involved in the struggle because they were too far away and it was dark outside.

At approximately 2 a.m., Mentzer awoke and went upstairs. At that time, he noticed the living room furniture had been cut up and the stuffing strewn around the room. He also noticed a pair of black tennis shoes in the living room, which he recognized as belonging to McLemore. Mentzer later called the police and several family members.

Police discovered Torres' purse in the front yard of Torres' residence. The purse had a small amount of blood on it. Small amounts of blood were also found in the entryway to Torres' house.

At approximately 5 a.m. on September 2, 1997, several of Torres' family members went to McLemore's apartment complex looking for Torres. At that time, they encountered McLemore outside and asked him if he knew where Torres was. McLemore responded that he would "check [his] Caller I.D." and then ran behind the apartment complex and did not return while Torres' family members were outside.

On the morning of September 3, 1997, McLemore was arrested in connection with Torres' disappearance. At noon on September 3, Det. Michael Hoch was called to the Omaha police station to interview McLemore. During the interview, McLemore stated that Torres was supposed to come to his residence on the evening of September 1 but that she did not arrive. He admitted that he called Torres' residence three times looking for her. He stated that he became angry and decided to walk to Torres' house, taking a knife with him and stopping along the way to purchase a bottle of beer. A bottle of beer was found on a picnic table in Torres' backyard. McLemore admitted that he had been at Torres' residence from 12:04 to 12:45 a.m. on September 2 and that he had sliced up Torres' furniture, cutting his finger in the process. He stated that he left the residence at 12:45 a.m. and began walking home, discarding the knife along the way.

McLemore also told Hoch that later in the day on September 2, 1997, while at a schoolyard drinking alcohol and looking at a photograph of Torres, McLemore became despondent and attempted suicide by cutting his wrists. However, the wounds stopped bleeding, and McLemore then walked back to his apartment complex, where he was later arrested.

After the interview with Hoch, McLemore was booked by detention technician Brenda Rocha. During the process of booking McLemore, Rocha asked McLemore what brought him to town. McLemore responded, "This girl." McLemore then stated, referring to "this girl," that he drove her car, that his fingerprints would be in her car, and that his hair would be on her. Upon

noticing the cuts on McLemore's wrists, Rocha asked McLemore why he did that. McLemore responded, "I loved that girl. I loved her." McLemore did not identify by name the "girl" he was referring to.

After McLemore was arrested on September 3, 1997, police searched McLemore's apartment, taking certain items into evidence, including a black belt and several items of McLemore's clothing retrieved from a closet area. The black belt was later identified by Alvarado as the belt Torres was wearing when she went out on the evening of September 1.

At approximately 10:30 p.m. on September 3, 1997, Torres' car was found in the parking lot of a dentist's office located a few blocks from McLemore's apartment complex. The car had been in the parking lot since the morning of September 2. The car was towed to police headquarters where the trunk was opened. Torres' body was found inside the trunk.

Torres' death resulted from internal and external bleeding due to 54 to 56 cutting and stabbing wounds to the left side of the face, neck, chest, abdomen, and upper extremities. These wounds included a stab wound to the chest which penetrated Torres' heart, several stab wounds to the abdomen which penetrated her intestines, and a significant cutting wound to the neck which cut into the larynx. The wounds to the arms and hands were "defensive wounds," which Torres sustained while trying to defend herself from the assault.

On January 9, 1998, McLemore was charged with first degree murder and use of a weapon to commit a felony in connection with Torres' murder. On January 14, 1999, McLemore filed a motion to preclude the State from making any reference at trial to his previous conviction and incarceration which had occurred in another state. The trial court sustained the motion on January 19.

On June 21, 1999, the day trial was scheduled to begin, McLemore made a motion for continuance to allow McLemore to secure testimony from Roxanne Berres, a former girl friend of Szeliga, in order to establish a "pattern of violence against women" by Szeliga. The trial court overruled the motion and determined that Berres' testimony was not relevant and was inadmissible under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404

(Reissue 1995). The State then made a motion in limine with respect to Berres' anticipated testimony, claiming the testimony was irrelevant. The trial court sustained the motion.

The case proceeded to trial, beginning on June 21, 1999. Evidence admitted at trial showed that blood found in Torres' house, in Torres' car, and on Torres' purse and clothing matched only Torres' blood. Blood found on McLemore's clothing recovered from the closet area of McLemore's apartment matched only McLemore's blood. Torres' car was examined for fingerprints by Donald Veys, a criminalist for the Omaha Police Department. Veys testified that environmental factors, such as the passage of time and moisture, can destroy fingerprints, and that the only print recoverable from Torres' car was a palm print, which could not be matched to Torres, McLemore, or any other suspects.

The State elicited testimony from several witnesses regarding statements Torres made to them about her fear of McLemore and statements McLemore had made regarding his feelings toward Torres. Such testimony included testimony from Mentzer that Torres told him that "she was concerned with her safety" because "of a statement [McLemore] made." This testimony was admitted without objection.

Carolyn Ludwig and Terri Holcomb, friends of Torres, also testified that Torres had told them she was afraid of McLemore. Holcomb testified that on August 31, 1997, Torres told her that McLemore "was very controlling, that she was afraid of him, and that she wanted to break it off with him." Holcomb further testified that on that same day, she and Torres were discussing Torres' husband's wanting to get back together with Torres. Holcomb then testified that McLemore interjected at that point, stating, "if he couldn't have her, nobody could have her." This testimony was admitted without objection. Ludwig testified, without objection, that toward the end of August, McLemore told her he was in love with Torres and "[w]ould never let her go." Ludwig also testified that on August 31, Torres told her in reference to McLemore, "She was scared of him. She did not want to go with him." Finally, Ludwig testified, again without objection, that McLemore stated in reference to Torres that "if he couldn't have her, nobody was going to have her."

Evidence was also adduced regarding McLemore's behavior on the morning and early afternoon of September 2, 1997. Donald Grimm, a former roommate of McLemore, testified that around 8:30 a.m. on September 2, McLemore came to Grimm's residence and told Grimm that Torres was missing. During Grimm's testimony, the following exchange took place:

[Prosecution:] . . . What did he say about his standpoint after he told you that?

[Grimm:] He told me that they would probably try to blame him —

Q. Okay.

A. — because he —

Q. I'm sorry, go ahead.

A. Because the shit he was in before, you know, for down in North Carolina.

Defense counsel objected on the basis that the testimony was in violation of the pretrial order because it alluded to McLemore's prior conviction and incarceration. The trial court overruled the objection. After Grimm's testimony, McLemore made a motion for mistrial based on this testimony. In ruling on the motion for mistrial, the court stated "[T]he statement, itself, doesn't violate any of our pretrial orders in this case, as I indicated, nothing about prior convictions, nothing about prior incarcerations. The motion will be overruled."

Theresa Spivey, controller of the company where McLemore was employed, testified that on the morning of September 2, 1997, McLemore came to his workplace and gave his resignation. Spivey testified that McLemore indicated the reason he quit his job was "he would be going away for a long time and would not be able to work any longer." Evan McPhillips, the leasing agent at McLemore's apartment complex, testified that between noon and 1 p.m. on September 2, he received a telephone call from McLemore. McLemore told McPhillips that he would not be able to continue his lease because "he and his girlfriend had gotten into a fight and that he thought he might be going to jail."

Willie Martin, an inmate housed in the same area as McLemore at the Douglas County correctional facility from

September 16 to October 10, 1997, testified about conversations Martin had had with McLemore regarding Torres' murder. Martin had been previously convicted of four felonies and had three previous convictions for giving false information.

Martin testified that 2 to 3 days after McLemore's arrival at the facility, McLemore told him that he had been charged with criminal mischief for entering the home of a woman he had been dating and cutting up her furniture. McLemore told Martin that the woman was a real estate agent who had several children. Martin further testified that McLemore stated that one day when it was "pouring down rain," McLemore had placed several telephone calls to the woman's house but was unable to reach her. McLemore told Martin that he became angry when he could not reach the woman because he believed that she was with another man.

Martin testified that McLemore stated that he then started walking to the woman's house in the rain and entered the house through an unlocked patio door. Martin testified that McLemore stated that he became angry while waiting for the woman and cut up her furniture with a knife he had brought with him, cutting his finger in the process. McLemore then stated that the woman came home and that a struggle ensued. McLemore told Martin that he forced the woman outside and into her car. Martin testified that McLemore stated that "the bitch kept talking shit so I had to do something to her" and that he and the woman then "drove somewhere" in her car. McLemore told Martin that he "wasn't going to let her walk out of his life" and that he pulled out a knife and cut the woman's throat. McLemore told Martin that he put the woman's body in the trunk of the car and that McLemore knew that his fingerprints were in the car. McLemore stated that he left the car parked in the rain and started walking home, throwing the knife away as he walked. At the time Martin had these conversations with McLemore, the police had not released any information about how Torres had died.

Martin testified that a few days after McLemore told him these things, he saw news reports dealing with Torres' death. At that time, he realized that this was the woman McLemore had been telling him about and contacted the police to give them the information.

At the beginning of McLemore's case in chief, when it appeared that he was going to call Szeliga as a defense witness, the State made a motion in limine regarding a sexual encounter between Torres and Szeliga which allegedly occurred some time during the week of Torres' murder. The court overruled the State's motion. However, McLemore then decided not to call Szeliga as a defense witness. McLemore also made an offer of proof regarding Berres' testimony. The trial court again found the testimony irrelevant and sustained the State's objection to such testimony.

The defense introduced testimony from one of its witnesses stating that when Torres stopped by Szeliga and Cullinane's residence on the evening of September 1, 1997, Torres spoke with only Szeliga. The State later called Szeliga as a rebuttal witness for the purpose of rebutting this testimony. Prior to presenting Szeliga's testimony, the State made a motion that McLemore's cross-examination of Szeliga be limited to the scope of direct examination and that McLemore not ask Szeliga any questions regarding the alleged sexual encounter with Torres the week of the murder. The court sustained the motion. Szeliga then testified that both he and Cullinane spoke with Torres when Torres stopped by.

After Szeliga's rebuttal testimony, McLemore made an offer of proof regarding questions he would have asked Szeliga on cross-examination. McLemore claimed he would have asked whether Szeliga had lied to a police detective, initially telling the detective that he did not have a sexual encounter with Torres the week of the murder, but later admitting to the detective that such an encounter had occurred. McLemore claimed that the purpose of such questioning was to impeach Szeliga's credibility. The State objected to the offer of proof, claiming that such testimony would be beyond the scope of direct examination and that McLemore could have adduced this testimony had he chosen to call Szeliga during his case in chief. The court agreed with the State's analysis and sustained the State's objection to the offer of proof.

The jury found McLemore guilty on both counts, and he was sentenced to life in prison on the murder conviction and not less than nor more than 20 years' imprisonment for use of a weapon. McLemore filed a notice of appeal and a poverty affidavit, and was granted leave to proceed in forma pauperis on appeal.

## ASSIGNMENTS OF ERROR

McLemore claims the trial court erred in (1) failing to grant his motion to dismiss and in accepting the guilty verdicts when the evidence was insufficient to sustain the convictions, (2) not excluding altered testimony of eyewitnesses, (3) failing to grant his motion for mistrial due to Grimm's mention of the "North Carolina" incident, (4) admitting certain hearsay testimony, and (5) not allowing him to present evidence regarding the past domestic abuse incident between Szeliga and Berres and not allowing him to cross-examine Szeliga regarding the alleged sexual encounter with Torres. McLemore also asserts that his constitutional rights were violated due to ineffective assistance of trial counsel.

## STANDARD OF REVIEW

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000).

■ The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000).

■ In a jury trial of a criminal case, an erroneous evidential ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. In determining whether error in admitting evidence was harmless, an appellate court bases its decision on the entire record in determining whether the evidence materially influenced the jury in a verdict adverse to the defendant. *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000).

## ANALYSIS

### JURISDICTION

■ Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has juris-

diction over the matter before it. *State v. Campbell,* 260 Neb. 1021, 620 N.W.2d 750 (2001). The State claims this court lacks jurisdiction over McLemore's appeal because McLemore failed to comply with Neb. Rev. Stat. § 25-2301.01 (Cum. Supp. 2000), which sets forth the procedure for commencing an appeal in forma pauperis. The State claims McLemore failed to file a proper "application" to proceed in forma pauperis as required by § 25-2301.01. The State claims § 25-2301.01 requires the filing of an application separate from the poverty affidavit and that this court lacks jurisdiction over McLemore's appeal because he did not file an "application" separate from his poverty affidavit. However, McLemore's failure to file an "application" separate from his poverty affidavit does not divest this court of jurisdiction. See *State v. Campbell, supra.* We determine that we have jurisdiction over McLemore's appeal.

### SUFFICIENCY OF EVIDENCE

McLemore first claims there was insufficient evidence to support his convictions. When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Rieger, supra.*

McLemore was charged with first degree murder and use of a weapon to commit a felony. The elements of first degree murder in Nebraska are intent to kill, premeditated malice, and deliberate malice. *State v. Lyle,* 258 Neb. 263, 603 N.W.2d 24 (1999). The State bears the burden of proving all of these elements beyond a reasonable doubt. *Id.* To convict a defendant of use of a weapon to commit a felony, the State must prove the defendant used a deadly weapon to commit any felony. Neb. Rev. Stat. § 28-1205 (Reissue 1995).

McLemore claims the evidence was insufficient to convict him because there was no blood or DNA evidence connecting him to Torres' murder, the eyewitnesses' descriptions of the male involved in the altercation with Torres outside Torres' residence did not match McLemore, and Torres' family members did not initially mention Torres' fear of McLemore to police.

McLemore further claims the evidence was insufficient to convict him because the tennis shoes found in Torres' living room were not "tested" to prove they belonged to McLemore, Martin's testimony regarding McLemore's confession was not credible, and the time of Torres' death was not proved.

McLemore's assertions do not show the evidence was insufficient to convict McLemore. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000). Such matters are for the finder of fact. *Id.* We determine, as discussed below, that the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the convictions.

■ The facts taken in the light most favorable to the State are such that the jury could conclude beyond a reasonable doubt that McLemore committed murder and used a knife to commit this felony. In regard to the first degree murder charge, the intent to kill sufficient to support a conviction may be inferred from the defendant's deliberate use of a deadly weapon in a manner likely to cause death. *State v. Sims*, 258 Neb. 357, 603 N.W.2d 431 (1999). The evidence supports the finding that McLemore intentionally killed Torres by using a deadly weapon in a manner likely to cause death. McLemore admitted to taking a knife with him to Torres' residence and to using the knife to cut Torres' throat. The evidence shows Torres suffered 54 to 56 cutting and stabbing wounds, sustaining significant injuries which caused her death, as well as defensive wounds sustained in attempting to fend off her attacker. From this evidence, a jury could reasonably find that McLemore intended to kill Torres by cutting and stabbing her with the knife.

■ A jury could also reasonably find that McLemore killed Torres with premeditated and deliberate malice. The term "premeditated" means to have formed a design to commit an act before it is done. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998). One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. *State v. Sims, supra.* "Deliberate" means not suddenly, not rashly. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995). Deliberation

requires that the defendant considered the probable consequences of his or her act before doing the act. *Id.*

The jury could reasonably find that McLemore formed a design to kill Torres prior to committing the act and that the act was not done suddenly or rashly. McLemore admitted to becoming angry with Torres after waiting for her to arrive at his apartment and placing several telephone calls to determine her whereabouts. McLemore then decided to walk 5 miles in the rain to Torres' residence, taking a knife with him, and waiting outside the house to make sure Alvarado was not coming back. He admitted to entering the house and destroying the furniture. When Torres came home, an altercation ensued, culminating in McLemore's putting Torres into her car and driving to another location, where he stabbed Torres to death. McLemore admitted to cutting Torres' throat and putting her body in the trunk of her car.

This evidence supports the jury's finding that the essential elements of first degree murder and use of a weapon to commit a felony existed beyond a reasonable doubt. The evidence was sufficient to find McLemore guilty of first degree murder and use of a weapon to commit a felony.

## EYEWITNESS TESTIMONY

■ McLemore next claims the trial court erred in not excluding testimony of eyewitnesses Rodney, Joanne, and Drew Givens. McLemore claims the prosecution made certain suggestions to these witnesses regarding their descriptions of the man they saw involved in the altercation with Torres, resulting in these witnesses' giving "altered" testimony. However, the record shows that McLemore did not object to the eyewitnesses' descriptions of the assailant. A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999). Thus, this assignment of error is without merit.

## MOTION FOR MISTRIAL DUE TO GRIMM'S TESTIMONY

McLemore claims the trial court erred in not granting his motion for mistrial which was made after Grimm's testimony.

Defense counsel objected to Grimm's mention of "the shit [McLemore] was in before, you know, for down in North Carolina." The trial court overruled the objection and later overruled McLemore's motion for mistrial based on this testimony, determining that the testimony was not in violation of the pretrial order regarding McLemore's prior conviction and incarceration because Grimm's statement did not mention that McLemore had been previously convicted or incarcerated.

The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Myers*, 258 Neb. 272, 603 N.W.2d 390 (1999). Grimm's statement in the present case did not violate the pretrial order. Grimm's vague statement did not inform the jury of the nature of the incident in "North Carolina," nor did it mention McLemore's previous conviction and incarceration. The trial court did not abuse its discretion in not granting McLemore's motion for mistrial.

## HEARSAY TESTIMONY

McLemore further claims the trial court erred in allowing certain witnesses to testify about statements Torres made regarding her fear of McLemore and certain statements McLemore made regarding his state of mind. McLemore claims that testimony from Torres' daughter Brandy Lucero, Torres' mother, Mentzer, Alvarado, Ludwig, and Holcomb regarding these issues was hearsay and erroneously admitted into evidence.

 Our review of the record shows that much of the testimony in question was admitted without objection. As stated previously, a party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Lotter, supra.* Some of the testimony in question was not hearsay. Other portions of the testimony in question were stricken from the record upon sustained objections, and the jury was instructed to disregard that testimony. Ordinarily, when an objection to or motion to strike improper evidence is sustained and the jury is instructed to disregard it, such instruction is deemed sufficient to prevent prejudice. *Id.* Based on our review of the record, we

determine that McLemore waived his right on appeal to assert prejudicial error concerning the testimony which was received without objection and was not prejudiced by the testimony that was stricken from the record.

Assuming without deciding that the remaining testimony regarding Torres' statements of fear and McLemore's state of mind was erroneously admitted, such testimony was cumulative of other testimony regarding the same subject matter that was admitted without objection. Ludwig and Holcomb testified without objection that Torres "was afraid of" McLemore, was "scared of" McLemore, and that Torres "did not want to go with" McLemore. Ludwig and Holcomb also testified that McLemore had stated in regard to Torres that "if he couldn't have her, nobody could have her," and that he "[w]ould never let her go." Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000). The testimony which McLemore claims was erroneously admitted was cumulative of other testimony admitted without objection, and as discussed previously, there was other competent evidence to support McLemore's conviction.

### EVIDENCE REGARDING SZELIGA

McLemore claims the trial court erred in not allowing him to present evidence regarding Szeliga's history of domestic violence and in not allowing him to present evidence regarding an ongoing sexual relationship between Szeliga and Torres. McLemore claims that he should have been allowed to present testimony from Berres, Szeliga's former girl friend, regarding a domestic abuse incident between Berres and Szeliga which occurred in 1995. The trial court determined that Berres' testimony was not relevant and was inadmissible under § 27-404(2). Section 27-404(2) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. In making its ruling, the court determined that because there was no evidence of a violent relationship between Szeliga and Torres, there was an insufficient nexus between the present case and

Szeliga's alleged abusive conduct toward other women. Thus, the court determined that Berres' testimony regarding the violent relationship between herself and Szeliga was not relevant.

The trial court did not abuse its discretion in determining that Berres' testimony was not relevant. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995). The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion. *State v. Kinser*, 259 Neb. 251, 609 N.W.2d 322 (2000). The incident between Berres and Szeliga occurred in 1995, 2 years prior to Torres' murder. Furthermore, no evidence was presented at trial of a violent relationship between Torres and Szeliga which could arguably make Berres' testimony regarding the violent relationship between her and Szeliga relevant to determining the issues in the present case. The trial court did not abuse its discretion in determining that Berres' testimony was not admissible.

McLemore further contends the trial court erred in not allowing him to cross-examine Szeliga about a sexual encounter with Torres that allegedly occurred the week of the murder. Szeliga was called as a rebuttal witness for the State. Rebuttal evidence is confined to that evidence which explains, disproves, or counteracts evidence introduced by the adverse party. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). The State called Szeliga for the limited purpose of rebutting testimony from a defense witness that Torres spoke only with Szeliga when she stopped by Szeliga and Cullinane's residence on the evening of September 1, 1997. Szeliga testified that both he and Cullinane spoke with Torres when Torres stopped by their residence. Szeliga testified on direct examination as to this issue only, and the trial court limited cross-examination to the issues raised on direct examination.

Pursuant to Neb. Evid. R. 611(2), Neb. Rev. Stat. § 27-611(2) (Reissue 1995), courts limit cross-examination of witnesses to the subject matter of the direct examination and matters affecting the credibility of the witness. *State v.*

*Bjorklund, supra.* McLemore claims that the questions he intended to ask Szeliga regarding the sexual encounter with Torres the week of the murder were for the purpose of impeaching Szeliga's credibility. However, the trial court recognized that McLemore could have introduced testimony regarding the sexual encounter by calling Szeliga during his case in chief, but chose not to do so. The trial court recognized that McLemore's purpose in this line of questioning was not simply for the purpose of impeaching Szeliga's credibility, but was for the purpose of introducing evidence of the alleged sexual encounter between Torres and Szeliga the week of the murder. It is within the discretion of the trial court to control and limit cross-examination as necessary to prevent undue prejudice and thus produce a fair trial. *State v. Bjorklund,* 258 Neb. 432, 604 N.W.2d 169 (2000). The trial court correctly determined that the testimony McLemore sought to introduce on cross-examination exceeded the scope of direct examination and was not offered for the purpose of impeaching Szeliga's credibility. Under the circumstances of this case, the trial court did not abuse its discretion in limiting cross-examination of Szeliga to matters raised on direct examination.

### Ineffective Assistance of Counsel

Finally, McLemore claims his constitutional rights were violated by ineffective assistance of counsel. A claim of ineffective assistance of counsel need not necessarily be dismissed merely because it is made on direct appeal; the determining factor is whether the record is sufficient to adequately review the question. *State v. Cody,* 248 Neb. 683, 539 N.W.2d 18 (1995). When the issue of ineffective assistance of counsel has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. McCracken,* 260 Neb. 234, 615 N.W.2d 902 (2000).

The ineffective assistance of counsel issue in the present case was not raised or ruled upon at the trial court level. We determine that the record is not sufficient to adequately review McLemore's ineffective assistance of counsel claim. Thus, we do not address this issue on direct appeal.

## CONCLUSION

For the reasons stated above, McLemore's convictions are affirmed.

AFFIRMED.