STATE OF NEBRASKA, APPELLEE, V.
GERMAI R. MOLINA, APPELLANT.
713 N.W.2d 412

Filed May 5, 2006. No. S-04-1230.

Jerry L. Soucie and James R. Mowbray, of Nebraska Commission on Public Advocacy, and, on brief, Gerard A. Piccolo, Hall County Public Defender, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

GERRARD, J.

Germai R. Molina was convicted of second degree murder and child abuse resulting in death, arising out of the death of his 2-year-old daughter, Diana Molina. Molina was sentenced to a term of imprisonment of not less than 80 years to life on each conviction, sentences to be served consecutively. Molina appeals from his convictions and sentences. For the reasons that follow, we affirm the judgment of the district court.

## I. BACKGROUND

Diana, born September 18, 2000, was brought to the emergency room at St. Francis Hospital in Grand Island, Nebraska, at approximately 3:30 a.m. on July 23, 2003, by Molina and his wife, also named Diana (Mrs. Molina). Diana did not have a pulse and was not breathing on her own. When Dr. Barry Hoover, the emergency room physician, asked what had occurred, Molina "replied something about the child had fallen down some stairs and then he made a comment about something that a cousin had injured the child."

After a half hour of attempted resuscitation, Diana was pronounced dead. Dr. Hoover observed that Diana's body was covered from head to toe with bruising and swelling and had abrasions or superficial lacerations in the shape of a line. Dr. Hoover testified that he

> [n]oticed that she had a lot of bruising to her right ear, she had a smaller amount of bruising to the left ear; she had what we call periorbital ecchymosis or you can think of it as racoon eyes, she had bruising around both eyes; she had bruising and abrasion or a superficial laceration to the chin.

Dr. Hoover also testified that Diana

had on her back what we would call confluent ecchymosis. That means that there was bruising to the extent that the individual bruises melded into one large bruise almost; they — they overlapped each other. I mean, there was just a tremendous amount of bruising on the back and the front of the torso. She also had multiple linear abrasions or superficial lacerations, and again, by that I mean, injuries or markings on the body that were in a fine linear pattern just like you would draw a straight line and those were oriented at various angles.

Dr. Hoover opined that Diana's injuries were not consistent with a fall down the stairs, but had been caused by blunt force trauma, inflicted by a belt or similar item within 24 to 36 hours before Diana's death. The pediatrician on call for the hospital who had assisted with Diana's care also observed Diana's injuries and similarly opined that the injuries were inconsistent with falling downstairs and had not been caused accidentally.

Dr. Jerry Jones, a pathologist at the University of Nebraska Medical Center, performed an autopsy on Diana the day after her death. Dr. Jones testified that Diana's body was covered with bruises and abrasions that were indicative of blunt trauma. Dr. Jones stated that the extent of the bruising indicated that "[t]his young lady underwent a horrendous beating prior to when — before she died." Dr. Jones identified particular bruises as defensive wounds, indicating that Diana "was trying to protect herself." Dr. Jones also identified severe hemorrhages on the front of Diana's scalp, back of the scalp, and midoccipital scalp, which injuries were "proof positive of impacts to the head," and hemorrhaging on the surface of Diana's brain.

Dr. Jones opined that based on these findings, he was "certain" that Diana's death was caused by fatal blunt impact to the head. Based upon microscopic examinations of sections taken from the injuries, Dr. Jones opined that Diana's injuries had been sustained within 24 to 36 hours before her death. Specifically, Dr. Jones testified to a reasonable degree of medical certainty that the cause of Diana's death was "blunt trauma to the head with acute subdural and subarachnoid hemorrhage and diffuse brain swelling with compression of the brain stem" and that there was

"no possibility that these could have been sustained as a result of any accidental event." Dr. Jones stated:

> These injuries were all inflicted and they were all part and parcel of the same beating, and again as I indicated, this child endured a horrific beating all over her body including her head before her death, and again to reiterate, there is no possibility that this distribution and pattern and extent of these injuries could have been sustained in any accidental manner whatsoever.

Tim Meguire, an investigator with the Grand Island Police Department, began the investigation into Diana's death. Meguire testified that when he made contact with Molina at the hospital, Molina said that Diana had been injured falling down the stairs at the family's home. After viewing Diana's body, Meguire accused Molina of not being entirely truthful. When Meguire explained that the bruising he had observed did not seem to be consistent with falling down the stairs, Molina said that "some of the bruising had been — been there when he brought Diana up from El Salvador; again, that some of the family down there was abusing — abusing her." When Meguire said that the marks on Diana's body were more consistent with being struck by a belt, Molina admitted to spanking Diana for urinating on the floor. Meguire said that when Molina was told that Diana was dead, he "cried for a few moments."

Meguire placed Molina under arrest at the hospital and interviewed Molina later that morning in an interrogation room at the Grand Island police station. With one stipulated redaction, a video recording of the interview was played for the jury.

Molina said in the interview that the day before Diana's death, he woke up in the afternoon and went to register his car. He borrowed some money to pay for the registration and then went to the car dealer to get the title so he could register the car. He talked for a while with a friend who worked in automobile parts and then went to the Department of Motor Vehicles at about 4:30 p.m. Molina said he then went home and watched television with his wife.

The family lived in a two-story house in Grand Island. Molina and his wife slept in the basement with Diana and her younger

sister. The living room and kitchen were on the ground floor of the residence, and the bathroom and two bedrooms were on the upper floor. Molina's parents, Manuel and Nohemy Molina, slept in one of the upstairs bedrooms; Molina's sister, her son, and Molina's brother slept in the other bedroom.

After a time, Mrs. Molina went upstairs to cook food and Molina said he continued watching television in the basement with Diana. Molina went upstairs, and when he came back downstairs, Diana had urinated on the floor. Molina stated that he "spanked" Diana with a belt "four or five times" and then gave Diana some wipes and told her to clean it up, which she did. Molina said he went upstairs and told his wife what had happened, and she went downstairs and scolded Diana. They ate, and then Diana was given an apple to eat while Mrs. Molina did dishes and Molina returned to watching television. He was joined by his wife after Diana and her younger sister went to sleep. Molina said he and Mrs. Molina went to bed at about 1 a.m.

Molina said in the interview that about 2:30 a.m., Diana woke up and had to use the bathroom. Molina said he took her upstairs to use the bathroom, then cleaned her up. Molina said that as he was taking Diana back to bed, he turned at the top of the basement stairs to turn off the lights, and that Diana tripped and fell down the stairs. Molina said that when he got to her, she was unconscious. Molina said he splashed cold water on her face and rubbed alcohol on his hands and then on her nose, but Diana was unresponsive. He said he heard her heart beating, and he and Mrs. Molina attempted mouth-to-mouth resuscitation but did not know how. Molina put Diana in his car to take her to the hospital.

Molina explained in the interview that when he and his wife moved from El Salvador, Diana did not come with them because of concerns for her health. Diana had been left in El Salvador with her grandmother until Molina went on a bus to get her, about 1½ weeks before her death. When Molina was asked about the marks on Diana's body, Molina said that the marks on Diana's back were there when he picked up Diana in El Salvador. Molina said his wife's cousin in El Salvador had beaten Diana for breaking things.

However, Molina admitted in the interview that he had "spanked" Diana with a belt each of the four times she had

urinated in the bedroom, striking five or six blows each time. Diana had, according to Molina, been "spanked" in that way twice in the 2 or 3 days preceding the interview. Molina also admitted that he had "got kind of mad" when Diana urinated in bed and hit her a bit more that time. Molina also said that Diana had defecated in her pants about a week before the interview and had been "spanked" with a belt about six times on that occasion. Molina said that he had not shaken Diana or struck her with anything other than a belt. Molina admitted that he picked Diana up once by her hair, about 3 or 4 days before the interview, and told her to clean up where she had urinated. Diana's hair came out, and Molina said it was the last time he had done that. Molina explained that because Diana was 2, almost 3, years old, he told Diana when he punished her that she was old enough to know not to urinate in her room.

In the interview, Molina seemed confused by many of the questions about bruises and cuts on the front of Diana's body. Molina claimed that to his knowledge, Diana did not have bruises on her leg or head, or a mark on her nose, when she was taken to the hospital. Molina also claimed he did not know how Diana got a black eye, but suggested that maybe she had hit herself on the table. Molina said that he never saw anyone else spank her and that no one else had spanked her since she came to the United States. Molina specifically said he had not seen Mrs. Molina spank Diana.

Generally, Molina consistently claimed during the interview that Diana had fallen down the stairs. Molina seemed anxious during the interview, but was not particularly emotional until near the end of the interview, when he was told that he would be charged with first degree murder, and he became agitated and angry.

Molina was charged with one count of first degree murder and one count of child abuse resulting in death. Molina entered a plea of not guilty to each charge.

Mrs. Molina reached a plea agreement with the State and agreed to testify at Molina's trial. Mrs. Molina agreed to plead guilty to knowingly and intentionally permitting child abuse resulting in serious bodily injury, a Class III felony, and was to serve no less than 4 nor more than 20 years' imprisonment. Mrs.

Molina also understood that it was likely she would lose her parental rights to Diana's sister.

Mrs. Molina testified that she was awakened by "some noises" in the early morning hours on July 22, 2003, approximately 24 hours before Diana's death. Molina was awake and with Diana. Mrs. Molina said that Diana "was naked and her arms were raised and she was standing on top of something that looked like a white bucket." Diana's hair was wet, and there were marks on her body from a belt. Molina was sitting on the edge of the bed with the belt in his hand, telling Diana not to fall asleep, and that if she put her hands down, he was going to hit her with the belt. Mrs. Molina testified that Molina told her that he was punishing Diana because she had urinated in her crib. Mrs. Molina said that Molina kept Diana there for about 3 hours and hit her with the belt five times during that period. Mrs. Molina said she told Molina to let Diana go to sleep, but he refused, saying that Diana could not go to sleep because "she was always peeing and that she was filthy and that she was being punished." When Diana fell asleep and fell over, Molina put her back on her feet in the same position. Eventually, Molina put Diana in her crib.

Mrs. Molina testified that when she woke up around 10 a.m., Diana was again standing with her arms raised, and Molina was again telling her that if she dropped her arms, he would hit her with the belt. She remained in that position for approximately 2½ to 3 hours. Mrs. Molina said that when she told Molina not to make Diana suffer, Molina said that Mrs. Molina "needed to stop talking and telling him that because it would just make him spank her more and that it would just be best if I just would be quiet." Molina said that "he could do whatever he wanted because he was the father and he was the one that brought her into this world."

Mrs. Molina testified that about 1:30 or 2 p.m., Molina went out and got some food, and they then ate inside the room. Molina had Diana stand up again because she had urinated on the floor. Mrs. Molina testified that Molina was very angry and pulled Diana up by her hair, and a chunk of Diana's hair came out. Diana spent the rest of the day on her feet. If Diana lowered her arms, Molina yelled at her and hit her with a belt until she raised her arms again.

Mrs. Molina testified that around 8 p.m., Diana was allowed to drink some juice and eat an apple. Mrs. Molina said that she thought Diana "was very hungry because she was eating really fast and she was falling asleep and [Molina] went over and picked her up and spanked her or hit her about five times and then put her on top of the bucket again." Diana remained standing on the floor until Mrs. Molina went to bed at around midnight.

Mrs. Molina testified that she slept intermittently, but heard Diana say that her feet hurt and she wanted to go to bed. Molina would not let her and made her run around the room while Molina hit her. Mrs. Molina said it sounded as if Diana was running into the furniture or walls. Mrs. Molina said she heard Diana say she needed to use the bathroom, and Molina said he would take her out in the living room and "have her do it in the paper." Diana then told him she was finished, Molina said he would clean her up, and then they came back into the room.

Mrs. Molina testified that she heard Diana say her feet were hurting and that she wanted to sleep. After that, Mrs. Molina heard Diana screaming, and it sounded as if Molina was repeatedly hitting Diana with the belt. Mrs. Molina looked and saw Molina swinging Diana around and shaking her. Molina made Diana run and then after she fell, hit her repeatedly while she was on the floor. Mrs. Molina said that it sounded like Molina then repeatedly picked Diana up and dropped her to the floor "ten or twenty times." Molina hit Diana hard in the stomach; then, when Mrs. Molina looked, Molina was trying to get Diana up, but she was unresponsive. Molina told Mrs. Molina that Diana had fallen when he was bringing her back from the bathroom, but Mrs. Molina testified that she would have heard had Molina taken Diana up the stairs to the bathroom.

Mrs. Molina attempted to resuscitate Diana, but was unsuccessful. They decided to take Diana to the hospital, but Molina insisted on dressing her in an attempt to hide bruises that Mrs. Molina testified were "almost all over her body." According to Mrs. Molina, Molina "said that I should say that she had already come that way from El Salvador; that a cousin had beat her and that not all of those [bruises] were from him." "That I should say that — that what I had heard was that she had fallen down the

stairs when he — he was bringing her back from the bathroom." Mrs. Molina said that she told Molina " '[y]es,' that I would say that at the hospital so that he would take her to the hospital because if I didn't say that he wouldn't take her." They left for the hospital out the basement door, although that was not the door they usually used, because Molina said his mother was watching television and she would see what had happened and get worried.

Molina testified in his own defense. Molina said that during the afternoon of July 21, 2003, 2 days before Diana's death, Molina registered his car and then went to play baseball with a friend. Molina said that he got home about 9:30 or 10:30 p.m. Molina said he found that Diana was injured and put ice on her injuries. Molina testified that he thought Mrs. Molina had inflicted the injuries and that he told Mrs. Molina that it was child abuse.

Molina said that the next day, he got up and went car shopping. He remembered talking to a friend, Dan Mackey, at the car dealership. Molina then went home and was downstairs with his daughters while Mrs. Molina went upstairs to get something to eat. Molina left the house to go shop for automobile parts; passed the house of his cousin, Juan Retana; and saw Retana's car. Molina and Retana worked on the car and then went to a fast-food restaurant. They cruised for a while, and then Molina dropped off Retana and went home at around midnight.

Mackey, an employee of a used car dealership, testified that he talked to Molina at the dealership "around lunch time" on the day before Diana's death. Retana testified that he met Molina on the day before Diana's death, in the "[e]vening, like around 9:00; 9:00, 10:00." Retana testified that he and Molina talked and worked on Molina's car for 30 to 45 minutes, then went to get fast food. According to Retana, they ate for 45 to 60 minutes, then cruised for "[a]bout another hour, it was late, so I think I got home around 12:00, 12:00 or 1:00, somewhere around there."

Molina testified that after he got home, he watched television for a while and then went to bed. Molina testified that he was awakened by Diana, who said she had to go to the bathroom. Molina said he took Diana upstairs to use the bathroom, but she was limping, and Molina saw that Diana had new bruises she had

not had before. Molina testified that they went back downstairs, but when he stopped at the top of the basement stairs to turn out the light, Diana fell down the stairs. Molina said that he picked Diana up and took her to the bedroom, but she was unresponsive, and that he and Mrs. Molina tried to revive her. When that failed, they took Diana to the hospital.

Molina claimed that Mrs. Molina told him to tell the police that Diana's bruises had been inflicted by a cousin in El Salvador and that she told him she did not want to go to jail. Molina said that when he spoke to Meguire, Molina lied about the cousin in El Salvador, as his wife had suggested. Molina denied that he had caused any of Diana's injuries.

Molina was convicted and sentenced as set forth above, and filed a timely notice of appeal. Molina's appellate brief was filed on March 22, 2005. On July 7, Molina's trial counsel filed a motion to withdraw as Molina's counsel, accompanied by a June 24 affidavit in which Molina averred that he wished to assert ineffective assistance of counsel as an issue on appeal. On August 17, this court directed the trial court to appoint replacement counsel for Molina, and the trial court appointed the Nebraska Commission on Public Advocacy to represent Molina. The commission filed a motion for leave to file a replacement brief, but the State objected. This court entered an order directing Molina to file a supplemental brief, with any new content limited to claims of ineffective assistance of prior counsel.

Further factual details will be set forth below, as relevant to Molina's specific assignments of error.

## II. ASSIGNMENTS OF ERROR

In an appellate brief filed by trial counsel, Molina assigns, restated, that the district court erred in

(1) not granting Molina's motion to elect on double jeopardy grounds;

(2) not granting Molina's motion to vacate his second degree murder conviction on double jeopardy grounds;

(3) permitting the State to amend the information to endorse Dr. Matthias Okoye as a witness less than 30 days prior to trial;

(4) refusing to play for the jury the video recording of a pretrial police interview with Mrs. Molina;

(5) refusing to admit into evidence a letter from Molina to his mother; and

(6) not giving Molina's requested preliminary and final jury instructions with respect to: (a) lesser-included offenses of child abuse resulting in death, (b) the limiting instruction on statements admitted as relevant to credibility, (c) the State's burden of proof with respect to Molina's alibi, and (d) when the jury could go home after sequestration.

Molina also assigns that

(7) the State's comments during opening statements to the jury violated Molina's constitutional right to remain silent.

In a supplemental brief filed by the Nebraska Commission on Public Advocacy, Molina assigns, as restated, that

(8) the rule that requires a criminal defendant to raise issues of ineffective assistance of counsel on direct appeal when new counsel has been appointed should be overruled and replaced with the discretionary rule of *Massaro v. United States*, 538 U.S. 500, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003);

(9) there is plain error in that Molina received ineffective assistance of counsel at trial;

(10) there is plain error in that Molina received ineffective assistance of counsel in his original brief on direct appeal; and

(11) there is plain error in that the district court failed to conduct an evidentiary hearing on Molina's claim of ineffective assistance of counsel before allowing Molina's counsel to withdraw on direct appeal.

## III. ANALYSIS

### 1. DOUBLE JEOPARDY

In his first two assignments of error, Molina contends that his convictions violate the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions, because second degree murder is a lesser-included offense of child abuse resulting in death.

### (a) Background

On July 29, 2004, Molina filed a "Motion to Elect," asking the court "to Order the State to elect between Counts I and II of the most recent Amended Information," contending at that time that child abuse resulting in death was a lesser-included offense of first degree murder. At the hearing on the motion, Molina argued

that the two charges had different and inconsistent elements and that it would violate his due process rights to defend against the two charges in the same action. Molina conceded he did not believe the State could be compelled to elect between lesser-included offenses, but "it does not appear that under the current doctrine as adopted by the Nebraska Supreme Court that these two charges are, in fact, lesser includeds." Molina conceded his argument was inconsistent with his motion and said he "would indicate in the motion that I don't believe at this time it is a lesser included, under this analysis, and therefore, the motion should be modified in that area." The motion to elect was overruled.

After Molina was convicted, he filed a motion to vacate the murder conviction on double jeopardy grounds, arguing that second degree murder is a lesser-included offense of child abuse resulting in death. The court overruled the motion.

### (b) Standard of Review

Whether a crime is a lesser-included offense is determined by a statutory elements approach and is a question of law. See, *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993); *State v. Putz*, 11 Neb. App. 332, 650 N.W.2d 486 (2002), *affirmed* 266 Neb. 37, 662 N.W.2d 606 (2003). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Furrey*, 270 Neb. 965, 708 N.W.2d 654 (2006).

### (c) Analysis

The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *State v. Winkler*, 266 Neb. 155, 663 N.W.2d 102 (2003). The protection provided by Nebraska's double jeopardy clause is coextensive with that provided by the U.S. Constitution. *State v. Marshall*, 269 Neb. 56, 690 N.W.2d 593 (2005).

A determination of whether multiple convictions in a single trial lead to multiple punishments depends on whether the Legislature, when designating the criminal statutory scheme, intended that cumulative sentences be applied for conviction on

such offenses. *State v. Spurgin*, 261 Neb. 427, 623 N.W.2d 644 (2001). In both the multiple punishment and multiple prosecution contexts, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one for double jeopardy purposes is whether each provision requires proof of a fact which the other does not. *State v. McBride*, 252 Neb. 866, 567 N.W.2d 136 (1997).

### (i) Motion to Elect

In support of his first assignment of error, Molina argues that his "Motion to Elect" should have been granted on double jeopardy grounds. This assignment of error is without merit for two reasons.

First, Molina's argument on appeal is not only inconsistent with, but directly contradictory to, his argument in the trial court regarding his motion to elect. In the trial court, Molina denied that the case presented lesser-included offenses. A defendant in a criminal case may not take advantage of an alleged error which the defendant invited the trial court to commit. *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *cert. denied* 543 U.S. 1128, 125 S. Ct. 1088, 160 L. Ed. 2d 1081 (2005). Furthermore, an objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002). Molina's appellate argument was expressly disclaimed at trial, and we therefore need not consider it.

Second, we have clearly held that the State is not required to elect between charges when a crime and a lesser-included offense are charged in separate counts of the same information. See *State v. Hoffman*, 227 Neb. 131, 416 N.W.2d 231 (1987). As explained below, we reject Molina's lesser-included offense argument as presented in his motion to vacate. For purposes of resolving this assignment of error, however, we simply note that Molina's motion to elect would not have been properly granted if it had been based upon the reasoning of his appellate argument.

### (ii) Motion to Vacate

In support of his second assignment of error, Molina makes the same argument with respect to his motion to vacate: that second

degree murder is a lesser-included offense of child abuse resulting in death. This argument has not been waived. See *id.*

 Under *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or one is whether each provision requires proof of a fact which the other does not. *State v. Winkler*, 266 Neb. 155, 663 N.W.2d 102 (2003). When applying the *Blockburger* test to separately codified criminal statutes which may be violated in alternative ways, only the elements for which the defendant has been punished should be compared to determine whether multiple punishments have been imposed for the same offense. See *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *cert. denied* 543 U.S. 1128, 125 S. Ct. 1088, 160 L. Ed. 2d 1081 (2005).

The elements of second degree murder are the causation of death, intentionally, but without premeditation. See, Neb. Rev. Stat. § 28-304 (Reissue 1995); *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). Child abuse resulting in death is proscribed by Neb. Rev. Stat. § 28-707 (Cum. Supp. 2004), which provides, as pertinent to the charge in this case:

> (1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:
>
> . . . .
>
> (b) Cruelly confined or cruelly punished[.]
>
> . . . .
>
> (6) Child abuse is a Class IB felony if the offense is committed knowingly and intentionally and results in the death of such child.

It is clear, and Molina concedes, that child abuse resulting in death requires proof of an element that second degree murder does not: that the death was that of a minor child. See *State v. White*, 217 Neb. 783, 351 N.W.2d 83 (1984). However, second degree murder also requires proof of an element that child abuse resulting in death does not: an intent to kill. See *State v. Jackson*, 258 Neb. 24, 601 N.W.2d 741 (1999). Child abuse resulting in death requires proof of the defendant's intent to commit child

abuse, as defined in the subsections of § 28-707(1), but it does not require proof that the defendant intended to kill the minor child. Second degree murder, on the other hand, requires proof of an intent to kill. See, *Jackson, supra*; *State v. Clark*, 255 Neb. 1006, 588 N.W.2d 184 (1999); *State v. Smith*, 3 Neb. App. 564, 529 N.W.2d 116 (1995).

■ Because each offense requires proof of an element that the other does not, neither is a lesser-included offense of the other, and the Double Jeopardy Clause's protection against multiple punishments for the same offense is not implicated. Molina's second assignment of error is without merit.

### 2. Amendment of Information to Add Dr. Okoye as Witness

Molina argues that the court erred in permitting the State to amend the information, less than 30 days before trial, to add an additional witness. Molina argues that pursuant to Neb. Rev. Stat. § 29-1602 (Cum. Supp. 2004), when the death penalty is sought and the information contains a notice of aggravation, as was the case here, then the State cannot endorse additional witnesses less than 30 days before trial.

### (a) Background

On July 9, 2004, the State filed a motion to amend the information to add Dr. Matthias Okoye as an expert witness. The State explained that Dr. Okoye was to serve as a rebuttal witness to the defense's expert witness, Dr. Janice Ophoven. The State explained that while it did not believe amending the information to add a rebuttal witness was necessary, the State had "tried to come forward and do the right thing here." Molina objected, but stated that "if the Court is going to grant the motion, I'll probably have to ask for a continuance." On July 12, the court granted the State's motion to amend the information, concluding that it was within the court's discretion to permit the amendment and that although the addition of the witness was requested 18 days prior to trial,

> the purpose for which the witness is added was stated in open court by the State and the Court is of the opinion that the defense has sufficient time to take the witness's

deposition or investigate what the witness may or may not say and adequately prepare for this witness.

The amended information was filed on July 16.

On July 15, 2004, the parties appeared in court, where the State agreed to Molina's motion to depose Dr. Okoye, and the parties stipulated that the deposition had been scheduled for the following Monday, July 19. On July 26, Molina filed a motion for continuance, based in part on the allegation that while the deposition of Dr. Okoye had been held on July 19, the deposition transcript was over 200 pages long and had not been made available until July 26. On the same date, the court denied the motion for continuance, finding that there was nothing in the defense's motion "which indicates that the defense is prejudiced in any manner." Jury selection began on July 30.

Dr. Ophoven, a forensic pathologist, testified as a defense witness. She reviewed photographs from the home, hospital, and autopsy; medical records for Diana and Diana's sister; interviews and videotapes; histopathology; and Dr. Jones' autopsy report.

Dr. Ophoven indicated that no microscopic examination had been made of Diana's brain or spinal cord. Dr. Ophoven opined that how and when a brain injury occurred is not clear without a microscopic examination. Dr. Ophoven said that some of the autopsy findings had "not been examined and not documented" and that this resulted in unanswered questions. Dr. Ophoven opined that the autopsy was "incomplete and leaves serious unanswered questions in the determination as to why there was brain swelling."

Dr. Ophoven opined that "the blood inside of the skull is the consequence of blunt force trauma or injury to the head that resulted in bruises in the scalp and a small film of subdural over the surface of the brain" but that "[t]he blood itself was not sufficient to cause the swelling or herniation of the brain." Dr. Ophoven opined that the bald spot on Diana's head was old, not fresh.

Dr. Ophoven testified that from the information she was provided, she was unable to tell how Diana was injured. Dr. Ophoven testified that because only one section of skin was taken for microscopic examination, she could not verify whether Diana's different injuries could have been of different ages and

occurred at different times. Dr. Ophoven saw no evidence indicating that Diana's head had been struck against a hard surface 15 or 20 times. Because of the testing that had not been done, Dr. Ophoven said that no determination could be made whether Diana had been struck or had fallen and hit her head.

Dr. Okoye, a specialist in forensic pathology and cytopathology, testified as a rebuttal witness for the State. Dr. Okoye reviewed the autopsy performed by Dr. Jones and was provided with a copy of Dr. Ophoven's expert medical opinion report and a copy of her testimony. Dr. Okoye opined, within reasonable medical certainty, that Diana died from "blunt force trauma of the head associated with acute bilateral subdural hemorrhage and diffuse brain swelling, and in addition, there were contributory injuries, extensive contusions and abrasions of the face, trunk and extremities." Dr. Okoye ruled out a fall downstairs as the cause of Diana's injuries, since "[i]f this child suffered these injuries by just falling from the stairs, the child would have fallen 50 to [a] hundred times." Dr. Okoye opined that Diana's injuries were inflicted contemporaneously, 2 to 24 hours before her death. Dr. Okoye opined that additional microscopic slides of Diana's brain would not have contributed to the determination of Diana's cause of death, because naked-eye examination showed subdural and subarachnoid hemorrhaging, but no hemorrhage or contusion within the brain tissue, and further examination of the brain confirmed those findings. Dr. Okoye rejected Dr. Ophoven's testimony that staining microscopic slides could be used to date injuries.

(b) Standard of Review

The decision to grant or deny an amendment to a pleading rests in the discretion of the court. *State v. Bao*, 269 Neb. 127, 690 N.W.2d 618 (2005). Similarly, whether to permit the names of additional witnesses to be endorsed upon the information after the information has been filed is within the discretion of the trial court. See, § 29-1602; *State v. Brandon*, 240 Neb. 232, 481 N.W.2d 207 (1992). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Mason, ante* p. 16, 709 N.W.2d 638 (2006).

## (c) Analysis

Section 29-1602 provides:

All informations shall be filed in the court having jurisdiction of the offense specified therein, by the prosecuting attorney of the proper county as informant. The prosecuting attorney shall subscribe his or her name thereto and endorse thereon the names of the witnesses known to him or her at the time of filing. After the information has been filed, the prosecuting attorney shall endorse on the information the names of such other witnesses as shall then be known to him or her as the court in its discretion may prescribe, except that if a notice of aggravation is contained in the information as provided in section 29-1603, the prosecuting attorney may endorse additional witnesses at any time up to and including the thirtieth day prior to the trial of guilt.

The purpose of § 29-1602 is to notify the defendant as to witnesses who may testify against the defendant and give the defendant an opportunity to investigate them. See *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

But it has long been the rule in this state that the requirement that the names of the witnesses for the State must be endorsed upon the information has no application to rebuttal witnesses. *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000). Furthermore, a trial court may allow witnesses to be endorsed after an information is filed when doing so does not prejudice the defendant in the preparation of his or her defense. *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001).

In this case, Dr. Okoye testified as a rebuttal witness, and Molina has made no showing of how he was prejudiced by Dr. Okoye's endorsement less than 30 days prior to trial, nor has he assigned error to the overruling of his motion for continuance. It is impossible to conclude that Molina was prejudiced when he received more notice of Dr. Okoye's testimony than was required. In short, no abuse of discretion appears on this record. Molina's assignment of error is without merit.

### 3. Mrs. Molina's Video-Recorded Statement

Molina argues that the trial court erred in refusing to permit him to show the jury the entirety of Mrs. Molina's pretrial interview with police.

## (a) Background

Prior to trial, Mrs. Molina was interviewed by Lt. Bradley Brush of the Grand Island Police Department, during which interview Mrs. Molina made statements inconsistent with her later trial testimony. Mrs. Molina admitted at trial, on direct examination by the State, that during the interview with Brush, she claimed that Diana slept and played a game on the day before she died. Mrs. Molina admitted that during the interview, she did not describe the abuse to which she later testified. Mrs. Molina also admitted at trial that she told Brush that Molina had hit Diana only about 13 or 14 times. Mrs. Molina testified at trial that during her interview with Brush, she was untruthful because she had been affected by letters Molina sent to her in jail, in which he urged her to describe the circumstances of Diana's death as he had, and he told her that she would be considered an accomplice and would get 20 years to life in prison. Molina did not object to the State's examination of Mrs. Molina in that regard.

Prior to cross-examining Mrs. Molina, Molina indicated his intent to introduce the entire 6½-hour video recording of Brush's interview of Mrs. Molina. Molina argued that the video recording was admissible as extrinsic evidence of an inconsistent statement made by a witness. Alternatively, Molina argued that under the doctrine of completeness, the court had the discretion to admit the record of the entire conversation with Brush, and not just the statements of which evidence had been adduced by the State. The State objected, inter alia, on the basis that except for any prior inconsistent statements, the interview was hearsay.

The court denied Molina's request to play the entire 6½-hour interview. The court stated that Molina would have the opportunity to cross-examine Mrs. Molina with respect to any inconsistent statements, and to offer extrinsic evidence of those statements, but that the court was "not going to let you, in the middle of the trial, give me six and a half hours of tape and expect me to let the jury hear six and a half hours of tape." The court indicated it was willing to consider the context of particular inconsistent statements, but not to simply play the entire interview to the jury. Molina indicated a willingness to edit the interview to focus on particular inconsistent statements; the court indicated

that it did not believe the entire interview was relevant and that it needed Molina to be more specific to consider his request.

Molina cross-examined Mrs. Molina extensively, but did not attempt to impeach her with statements she made to Brush, or introduce the video recording of any part of the interview at that time. At the end of the day, the court formally overruled Molina's request to play the entire interview.

Later in the trial, Molina examined Brush and adduced testimony about the inconsistencies between Mrs. Molina's trial testimony and her statement to Brush. Molina also questioned Mrs. Molina's attorney about those inconsistencies. After the attorney and Brush testified, Molina again offered the entire 6½-hour interview into evidence, and the court sustained the State's objection to the exhibit. The court later explained that the basis of the exclusion was Neb. Evid. R. 403, "for the reason that it would cause undue delay and be a waste of time to play the whole six and a half hours as presented."

(b) Standard of Review

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Mason, ante* p. 16, 709 N.W.2d 638 (2006).

Under Neb. Evid. R. 106, the admission of evidence is not a matter of right, but rests with the sound discretion of the court. See *State v. Coffman,* 227 Neb. 149, 416 N.W.2d 243 (1987). Similarly, a ruling pursuant to rule 403 for exclusion of relevant evidence will be upheld on appeal unless the ruling is an abuse of discretion. *State v. Fahlk,* 246 Neb. 834, 524 N.W.2d 39 (1994).

(c) Analysis

Molina argues that Mrs. Molina's interview with Brush was admissible pursuant to Neb. Evid. R. 613 and rule 106.

Rule 613(2) provides in part that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require."

Rule 106 provides:

(1) When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. When a letter is read, all other letters on the same subject between the same parties may be given. When a detached act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence.

(2) The judge may in his discretion either require the party thus introducing part of a total communication to introduce at that time such other parts as ought in fairness to be considered contemporaneously with it, or may permit another party to do so at that time.

The problem with Molina's argument is that it is unresponsive to the basis upon which the district court actually excluded the evidence at issue. The court relied upon rule 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In this case, both the State and Molina adduced evidence of the prior inconsistent statements that were made by Mrs. Molina during the interview with Brush, so the jury was already aware of the statements. Molina was offered the opportunity to present sections of the interview and argue how those sections might have been admissible, under rule 106, to explain the context of Mrs. Molina's statements. Instead, Molina chose to offer the entire 6½-hour interview, and he did not explain in what way the entire interview was necessary to understand the statements about which evidence had already been adduced, and regarding which Mrs. Molina had been examined. Under such circumstances, we cannot say it was an abuse of discretion for the district court to conclude that the relevance of playing the entire video-recorded interview would be substantially outweighed by considerations of undue delay or wasting time. For that reason, we find no merit to Molina's assignment of error.

### 4. MOLINA'S LETTER TO HIS MOTHER

#### (a) Background

During surrebuttal, Molina's mother, Nohemy, identified a letter that she said Molina had sent her. In the letter, Molina related a version of events that was substantially consistent with his trial testimony. Molina argued that the letter was admissible as a prior consistent statement. The State's objection to the letter, on the basis of improper surrebuttal, was sustained. Molina claims that this ruling was erroneous.

#### (b) Standard of Review

The abuse of discretion standard is applied to an appellate court's review of a trial court's ruling on the admissibility of rebuttal testimony. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994).

#### (c) Analysis

Rebuttal evidence is confined to that which explains, disproves, or counteracts evidence introduced by the adverse party. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001); *Fahlk, supra.* A trial court may in its discretion permit the introduction of evidence in rebuttal that is not strictly rebuttal evidence only for good reason and in the furtherance of justice. *Fahlk, supra.*

Rebuttal evidence is confined to new matters first introduced by the opposing party and is not an opportunity to bolster, corroborate, reiterate, or repeat a case in chief. *Id.* See, also, *McLemore, supra* (no abuse of discretion in limiting cross-examination of rebuttal witness where defendant sought to adduce evidence that defendant could have adduced during case in chief). Here, Molina sought to adduce evidence, in surrebuttal, that simply reinforced the theory of the case he advanced in his case in chief. Molina could have attempted to introduce the letter in his case in chief, but did not do so.

Molina argues that the letter was responsive to Dr. Okoye's testimony in rebuttal of Dr. Ophoven. Essentially, Molina argues that the implication of Dr. Okoye's testimony was that Molina testified falsely when he said Diana fell down the stairs. Thus,

according to Molina, a prior consistent statement that Diana had fallen down the stairs was both responsive and admissible.

There are two reasons that this argument is without merit. First, Molina's letter was not a prior consistent statement as defined by Neb. Evid. R. 801(4), which provides in relevant part:

A statement is not hearsay if:

(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . .

Prior consistent out-of-court statements are defined as nonhearsay and are admissible to rebut a charge of recent fabrication, improper influence, or improper motive only when those statements were made before the charged recent fabrication, improper influence, or improper motive. *State v. Duncan*, 265 Neb. 406, 657 N.W.2d 620 (2003). But attempts at impeachment cannot be equated to charges of *recent* fabrication. *Id.* In this case, Dr. Okoye's testimony operated to impeach Molina's, but was not a charge of recent fabrication—as is clear from the fact that the "fabrication" at issue, that Diana fell down the stairs, was present in Molina's statement to police only a few hours after Diana's death.

More importantly, Dr. Okoye's testimony served to rebut Dr. Ophoven's criticism of the autopsy report and opinion of Dr. Jones. That was the "new matter" introduced in the State's rebuttal—not the contention that Diana had not been killed by a fall down the stairs, which was evident throughout the State's case in chief. Molina's letter served only to corroborate, in the most literal sense, Molina's case in chief, which, as previously stated, is not proper rebuttal evidence. See *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). As such, the district court did not abuse its discretion in excluding it.

### 5. JURY INSTRUCTIONS

#### (a) Lesser-Included Offenses of Child Abuse Resulting in Death

Molina argues that the jury should have been instructed on lesser-included offenses of child abuse resulting in death.

*(i) Background*

At the jury instruction conference, Molina requested lesser-included offense instructions for intentional child abuse and negligent child abuse as being lesser-included offenses of child abuse resulting in death. The request was denied, and the jury was instructed as follows:

> Depending on the evidence you may return one of several possible verdicts. You may find the defendant Germai R. Molina:

## II. AS TO COUNT II:

(1) Guilty of Child Abuse Resulting in Death; or

(2) Guilty of Child Abuse Resulting in Serious Bodily Injury; or

(3) Not guilty.

The elements of Child Abuse Resulting in Death are:

1. That the defendant Germai R. Molina caused Diana Molina, a minor child, to be cruelly confined or cruelly punished; and

2. That the defendant Germai R. Molina did so knowingly and intentionally; and

3. That the defendant Germai R. Molina's acts resulted in the death of Diana Molina, a minor child; and

4. That the defendant Germai R. Molina did these acts between July 22, 2003 and July 23, 2003; and

5. That the defendant Germai R. Molina did these acts in Hall County, Nebraska.

The elements of Child Abuse Resulting in Serious Bodily Injury are:

1. The defendant Germai R. Molina caused or permitted a minor child Diana Molina to be cruelly confined or cruelly punished; and

2. That the defendant Germai R. Molina did so knowingly and intentionally;

3. That the defendant Germai R. Molina's acts resulted in Diana Molina, a minor child, suffering serious bodily injury;

4. That the defendant Germai R. Molina did these acts between July 22, 2003 and July 23, 2003; and

5. That the defendant Germai R. Molina did these acts in Hall County, Nebraska.

## B. EFFECT OF FINDINGS

You must separately consider in the following order the crimes of:

Child Abuse Resulting in Death;

Child Abuse Resulting in Serious Bodily Injury.

For Child Abuse Resulting in Death you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element beyond a reasonable doubt, then you must find the defendant Germai R. Molina guilty of Child Abuse Resulting in Death and stop.

If you find that the state did not so prove, then you must proceed to consider the next crime in the list, Child Abuse Resulting in Serious Bodily Injury.

You must proceed in this fashion to consider each of the crimes in sequence until you find the defendant Germai R. Molina guilty of one of the crimes or find him not guilty of all of them.

The jury was also instructed on second degree murder and manslaughter as lesser-included offenses of first degree murder. The jury was instructed that to find Molina guilty of second degree murder, it must find that Molina caused the death of Diana "intentionally but without premeditation" and that to find Molina guilty of manslaughter, it must find that Molina killed Diana "unintentionally while in the commission of an unlawful act."

### (ii) Standard of Review

■ Whether a crime is a lesser-included offense is determined by a statutory elements approach and is a question of law. See, *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993); *State v. Putz*, 11 Neb. App. 332, 650 N.W.2d 486 (2002), *affirmed* 266 Neb. 37, 662 N.W.2d 606 (2003). Whether jury instructions given by a trial court are correct is a question of law. *State v. Anderson*, 269 Neb. 365, 693 N.W.2d 267 (2005). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Furrey*, 270 Neb. 965, 708 N.W.2d 654 (2006).

*(iii) Analysis*

As pertinent, § 28-707 provides:

> (1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:
>
> . . . .
>
> (b) Cruelly confined or cruelly punished[.]
>
> . . . .
>
> (3) Child abuse is a Class I misdemeanor if the offense is committed negligently.
>
> (4) Child abuse is a Class IIIA felony if the offense is committed knowingly and intentionally and does not result in serious bodily injury . . . .
>
> (5) Child abuse is a Class III felony if the offense is committed knowingly and intentionally and results in serious bodily injury . . . .
>
> (6) Child abuse is a Class IB felony if the offense is committed knowingly and intentionally and results in the death of such child.

To determine whether one statutory offense is a lesser-included offense of the greater, we look to the elements of the crime and not to the facts of the case. *State v. Putz*, 266 Neb. 37, 662 N.W.2d 606 (2003). A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *State v. Mason, ante* p. 16, 709 N.W.2d 638 (2006).

It is not disputed that negligent child abuse as defined by § 28-707(3) and intentional child abuse as defined by § 28-707(4) are lesser-included offenses of child abuse resulting in serious bodily injury as defined by § 28-707(5) and child abuse resulting in death as defined by § 28-707(6). See, *State v. Parks*, 253 Neb. 939, 573 N.W.2d 453 (1998); *State v. Nguth*, 13 Neb. App. 783, 701 N.W.2d 852 (2005). The question is whether the evidence in this case produces a rational basis for acquitting Molina of the greater offense but convicting him of the lesser offense.

The underlying act of child abuse, which provides the basis for all these offenses, is defined as causing or permitting the minor child to be "[c]ruelly confined or cruelly punished." See § 28-707. Here, there is no dispute that Diana was cruelly confined or punished, and the evidence would require the conclusion that either Molina or Mrs. Molina inflicted the abuse. Based on the evidence, there is no basis for concluding that the abuse was not inflicted knowingly and intentionally by either Molina or Mrs. Molina, or that the abuse did not result in serious bodily injury. Finally, the evidence would permit one of two conclusions regarding the cause of Diana's death: either Diana's death resulted from the knowing and intentional abuse that was inflicted upon her by Molina or Mrs. Molina, or Diana's death resulted from a fall downstairs.

To find Molina guilty of intentional child abuse, but not guilty of child abuse resulting in serious bodily injury or child abuse resulting in death, would require the jury to conclude that Molina knowingly and intentionally abused Diana or permitted her abuse, but that the abuse did not result in serious bodily injury. As previously stated, the evidence would simply not permit the conclusion that the abuse of Diana did not result in, at the least, serious bodily injury.

With respect to negligent child abuse, however, the question is more difficult. Molina argues that if the jury credited his testimony, it could have concluded that Mrs. Molina cruelly punished Diana and that Molina negligently permitted Mrs. Molina to do so. This would have permitted the jury to conclude that Molina was guilty of negligent child abuse, but not guilty of knowingly or intentionally abusing Diana himself. Molina's argument has merit.

The rationale for instructing the jury on lesser-included offenses is that, as explained by the U.S. Supreme Court,

> "if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from

theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction."

(Emphasis in original.) *Beck v. Alabama*, 447 U.S. 625, 634, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), quoting *Keeble v. United States*, 412 U.S. 205, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973). See, also, *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000).

In this case, the evidence would have been sufficient, had the jury credited Molina's testimony, for the jury to conclude that Molina had not knowingly or intentionally abused Diana, but had negligently permitted Mrs. Molina to do so. Had the jury reached that conclusion, however, the instructions as given would have required the jury to either find Molina guilty of intentional child abuse or find him not guilty. The jury was denied the "third option" that would have been necessary had the jury credited Molina's testimony. We conclude that the district court erred in not instructing the jury on the lesser-included offense of negligent child abuse.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Mason, ante* p. 16, 709 N.W.2d 638 (2006). Before an error in the giving of instructions can be considered as a ground for reversal of a conviction, it must be considered prejudicial to the rights of the defendant. *State v. Bao*, 263 Neb. 439, 640 N.W.2d 405 (2002). Molina's tendered instruction on the lesser-included offense of negligent child abuse was a correct statement of the law and was warranted by the evidence.

That, however, does not end our inquiry. While the court's instruction on the lesser-included offenses of child abuse resulting in death did not present the jury with an opportunity to find that Molina did not act intentionally, the court's instruction on the lesser-included offenses of first degree murder—second degree murder and manslaughter—required the jury to determine whether or not Molina intentionally caused Diana's death.

Under the instructions given in this case, intent to kill denoted the difference between second degree murder and manslaughter. See *State v. Jackson*, 258 Neb. 24, 601 N.W.2d 741 (1999). The question is whether the jury's finding that Molina was guilty of second degree murder, and not manslaughter, demonstrates that the court's failure to instruct the jury on negligent child abuse was not prejudicial.

In that regard, a number of courts have found that " '[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions.' " *People v. Horning*, 34 Cal. 4th 871, 906, 102 P.3d 228, 252, 22 Cal. Rptr. 3d 305, 333 (2004). See, e.g., *State v. Lynch*, 98 Ohio St. 3d 514, 787 N.E.2d 1185 (2003); *Commonwealth v. Chase*, 433 Mass. 293, 741 N.E.2d 59 (2001); *Colwell v. Com.*, 37 S.W.3d 721 (Ky. 2000); *People v. Millwee*, 18 Cal. 4th 96, 954 P.2d 990, 74 Cal. Rptr. 2d 418 (1998); *State v. Barletta*, 238 Conn. 313, 680 A.2d 1284 (1996); *Brown v. State*, 183 S.W.3d 728 (Tex. App. 2005); *State v. Marshall*, 197 Ariz. 496, 4 P.3d 1039 (Ariz. App. 2000); *People v Simonds*, 135 Mich. App. 214, 353 N.W.2d 483 (1984). As explained by the California Supreme Court,

> "in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury."

*People v. Flood*, 18 Cal. 4th 470, 483, 957 P.2d 869, 877, 76 Cal. Rptr. 2d 180, 188 (1998), quoting *People v. Sedeno*, 10 Cal. 3d 703, 518 P.2d 913, 112 Cal. Rptr. 1 (1974).

We find that rule to be applicable here. The jury in this case was given the opportunity, on count I, to determine whether or not Molina acted with or without intent, and it determined that

he acted with the intent to kill. That same jury could not have concluded that Molina acted without intent with respect to count II. Compare, e.g., *Lynch, supra*; *Colwell, supra*; *Millwee, supra*; *Barletta, supra*; *Brown, supra*; *Simonds, supra*. The court's refusal to instruct the jury on negligent child abuse was not prejudicial to Molina, because the jury necessarily rejected the evidence that would support a finding that only the lesser-included offense was committed. See *Flood, supra*. In view of the actual verdict returned by the jury, there is no reasonable or plausible basis for finding that the instructional error affected the jury's verdict. Molina was not prejudiced by the court's refusal to instruct the jury on negligent child abuse.

#### (b) Limiting Instructions on Statements Relevant to Credibility

Molina argues that the trial court erred in its final jury instruction regarding inconsistent statements admitted as relevant to witness credibility.

#### (i) Background

Manuel, Molina's father, testified that he was working outside on the day before Diana's death and that based on the absence of Molina's car, Molina had left the house at about 4 p.m. and returned at around midnight or 1 a.m.; however, Manuel did not actually see Molina leave. Manuel was cross-examined with respect to inconsistencies between his trial testimony and statements he made to Meguire regarding the events of that day and statements made to police shortly after Diana's death.

Nohemy, Molina's mother, testified that a few days before Diana's death, she saw Mrs. Molina grab Diana by the hair, because Diana was about to fall down the stairs, and pull out some of Diana's hair. Nohemy also testified that she saw Diana in the kitchen on the day before she died, at around noon, while Mrs. Molina was in the kitchen heating food. Nohemy was also cross-examined with respect to inconsistencies between her trial testimony and statements she made to Meguire regarding the events of that day, and statements made to police shortly after Diana's death.

Douglas Cline, a Grand Island police officer, testified regarding interviews conducted with Nohemy and Manuel, in which

Cline served as interpreter. Cline testified that during the interviews, Nohemy and Manuel had not related the events described in their trial testimony. Nohemy and Manuel testified in surrebuttal that Cline did not speak Spanish very well and did not understand what he was being told.

The court later instructed the jury as follows:

During this trial I called your attention to certain out-of-court statements that were received in evidence only to aid you in deciding the credibility of the witnesses. *You must consider the statements of Diana Molina, Manuel Molina and Nohemy Molina only with regard to the credibility of these witnesses and for no other purpose.*

(Emphasis supplied.) Molina objected to the last sentence, arguing that only portions of the testimony of those witnesses were being proffered for a limited purpose but that the effect of the court's instruction would extend to the testimony of those witnesses in its entirety. Molina argued for a proposed jury instruction based on the Nebraska Jury Instructions, "'You are only to consider these for a limited purpose when I told you to consider them for a limited purpose,'" but the court overruled the objection.

### (ii) Standard of Review

Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Grosshans*, 270 Neb. 660, 707 N.W.2d 405 (2005).

### (iii) Analysis

NJI2d Crim. 5.3A provides as follows: "During this trial I called your attention to some evidence that was received for specified limited purposes; you must consider that evidence only for those limited purposes and for no other." We have said that in any situation in which a limiting instruction was given at the time evidence was introduced, NJI2d Crim. 5.3 must be given at closing if requested. *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), *overruled on other grounds, State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997).

For reasons not explained by the record, the court in this case departed from the language of NJI2d Crim. 5.3 and

instructed the jury as set forth above. Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case. *State v. Putz*, 266 Neb. 37, 662 N.W.2d 606 (2003). But in an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Grosshans, supra.*

Molina was not prejudiced in this case. The language used by the district court could have been more artfully crafted, and adherence to the Nebraska Jury Instructions is normally preferable; however, when read in context, the instruction given was not an incorrect statement of the law. The sentence that the jury "must consider the statements of [Mrs.] Molina, Manuel Molina and Nohemy Molina only with regard to the credibility of these witnesses and for no other purpose" might be somewhat confusing if read in isolation. However, when read in context, it is clear that the "statements" of Mrs. Molina, Manuel, and Nohemy to which the instruction refers are not their entire testimony, but simply the prior inconsistent statements with which Mrs. Molina, Manuel, and Nohemy were impeached—the "out-of-court statements that were received in evidence only to aid [the jury] in deciding the credibility of the witnesses."

Jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is no prejudicial error. *State v. Williams*, 269 Neb. 917, 697 N.W.2d 273 (2005). This instruction fairly presented the law, and there is no prejudicial error.

### (c) Burden of Proof on Alibi Instruction

Molina argues that the alibi instruction given by the trial court was deficient because it did not specify the State's burden of proof.

### (i) Background

The jury was instructed:

> An issue in this case is whether the defendant Germai R. Molina was present at the times and places alleged, namely, 224 East Second Street, during July 22 and July 23, 2003. The State of Nebraska must prove that he was.

Molina objected, stating that

> the defendant is requesting that the Court note that the — making the request that the Court instruct that the State is required to prove beyond a reasonable doubt that the defendant was at the — this particular place and partic- — at these particular times and without denoting what that burden is, we believe the same to be an improper burden shifting upon the defendant to prove his innocence in this particular case and we would object on that basis.

The objection was overruled.

The jury was instructed, before trial, that Molina was to be found not guilty "unless you decide the State of Nebraska has proved him guilty beyond a reasonable doubt based solely upon the evidence you hear in this case."

Prior to submission, the jury was again instructed to find Molina not guilty "unless you decide that the state has proved him guilty beyond a reasonable doubt." The jury was instructed that each of the elements of each crime must be proved beyond a reasonable doubt.

### (ii) Standard of Review

Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Grosshans*, 270 Neb. 660, 707 N.W.2d 405 (2005).

### (iii) Analysis

Molina's complaint is that the alibi instruction set forth above did not specifically iterate the State's burden of proof beyond a reasonable doubt.

▮▮▮▮ In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id.* In construing an individual jury instruction, the instruction may not be judged in artificial isolation but must be viewed in the context of the overall charge to the jury considered as a whole. *State v. Putz*, 266 Neb. 37, 662 N.W.2d 606 (2003). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues

supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *State v. Mason, ante* p. 16, 709 N.W.2d 638 (2006).

The State must prove beyond a reasonable doubt every element of the charged offense. *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996). But the proper inquiry is not whether a jury instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it. The constitutional question is whether there is a reasonable likelihood that the jury understood the instruction to allow conviction based on proof insufficient to meet the *In re Winship* standard. *Victor v. Nebraska*, 511 U.S. 1, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); *McHenry, supra.*

Read as a whole, the jury instructions repeatedly told the jury that the State had the burden of proving Molina guilty beyond a reasonable doubt. There was no suggestion that an alibi defense somehow shifted the burden of proof on that issue to Molina. Compare, e.g., *Boeche v. State*, 151 Neb. 368, 376, 37 N.W.2d 593, 596 (1949) (disapproving instruction to jury that alibi defense was proper and legitimate " 'if proven' " and that defendant did not have burden of proving alibi beyond reasonable doubt). The alibi instruction given to the jury plainly informed them that the State had the burden of proof, and the State's burden of proving Molina guilty beyond a reasonable doubt was clear from the instructions read as a whole. There is no reasonable likelihood that the jury applied the instructions in an unconstitutional manner, and Molina has not met his burden of showing any prejudice from the alleged error.

### (d) When Jury Could Go Home After Sequestration

Molina takes issue with the court's charge to the jury regarding the effect of sequestration.

### (i) Background

At the July 26, 2004, pretrial hearing, the court asked the parties for their preferences regarding sequestration of the jury. The parties agreed that with proper admonitions, there need not be sequestration until after the case was submitted to the jury. The court took that "as a waiver of complete sequestration and it

would be the Court's intent and purpose to then not sequester the jury once selected until the case is given to them for their deliberations and verdict."

Prior to submission, the jury was instructed:

> The procedure that will be followed is that as your deliberations commence you will be kept together until you reach a verdict this shall include meal times, which will be arranged for you as a group. *You may not go home at night if you have not reached a decision.*

(Emphasis supplied.) Molina objected to the last sentence, arguing that the court's wording would place undue pressure on the jury to reach a hastened decision. Molina argued that the jury should be instructed that " 'you will be kept together at meal times and may not go home at night.' " The objection was overruled.

The case was submitted to the jury the afternoon of August 11, 2004. A verdict was returned at 11:19 a.m. on August 12.

### *(ii) Standard of Review*

Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Grosshans*, 270 Neb. 660, 707 N.W.2d 405 (2005).

### *(iii) Analysis*

Under Neb. Rev. Stat. § 29-2022 (Reissue 1995), after submission of a criminal case to the jury, the defendant has the right to have the jury kept together until the jury agrees upon a verdict or is discharged by the court, and this right may be waived only by specific agreement or consent of counsel for the parties. *State v. Bao*, 263 Neb. 439, 640 N.W.2d 405 (2002). Section 29-2022 specifically states in part, in language mirroring the court's instruction, that "[w]hen a case is finally submitted to the jury, they must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict or are discharged by the court."

Molina argues that the court's instruction could have pressured the jury to reach a hurried decision. We reject this argument for two reasons. First, we note that the record is not consistent with a hurried decision: The jury was sequestered for a night after the cause was submitted, then rendered a verdict the next morning.

Second, and more importantly, when the language of the court's instruction is compared to that of Molina's proposed instruction, we can discern no meaningful difference. In point of fact, the statement that the jury could "not go home at night" if it had "not reached a decision" is entirely accurate and something that the jury would have quickly discerned on its own, even had Molina's proposed instruction been given.

In an appeal based on a claim of erroneous jury instructions, the appellant has the burden to show that the questioned instructions were prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005). There is no prejudice here.

For the foregoing reasons, we find no merit in Molina's sixth assignment of error.

### 6. STATE'S OPENING STATEMENT AND MOLINA'S RIGHT TO REMAIN SILENT

Molina argues that the State's opening statement had the effect of forcing Molina to surrender his right not to testify in his own defense.

### (a) Background

The State's opening statement referred at length to the findings of abuse that the State said would be proved by the medical evidence to be presented at trial. The State said the evidence would show that Diana's death was caused by intentionally inflicted blunt force trauma, not an accident. The State also referred to Molina's statement to police, in which he initially said that Diana had fallen down the stairs, but then admitted to beating her with a belt. The State also noted that Molina had said no one else in his family had struck Diana and that Molina had claimed not to observe injuries on Diana's body that were obvious when she was presented at the emergency room. The State concluded:

> Now, you are going to hear in a few minutes from the defense on their opening statement and it will be our first chance to hear what they believe the evidence will show.
>
> I'd ask you, certainly, to keep an open mind until you have heard the evidence for yourself. I'd ask you to keep an open mind as you listen to the story over the next —

unfold over the next four to five days, and as you listen to the evidence, keep in mind a couple of things. Keep in mind that the only person who said he had struck Diana was the defendant. That he, in fact, said he didn't know of anyone else having hit her. Keep in mind, that he's the one who says he used the belt to hit Diana, and I would ask you, ladies and gentlemen, a couple of other things.

I would ask of you, first of all, that you not confuse the senseless, brutal nature of this act with an unintentional one. Just because it makes no sense to us why someone would do this to a child for soiling herself and soiling her surroundings while potty training doesn't mean the acts aren't deliberate, and I will ask you not to confuse remorse after the act is committed for fear of getting caught or lack of guilt.

Ladies and gentlemen, the evidence will show you beyond a reasonable doubt that there was no stair fall. The evidence will show you there was no accident. Well, wait. There was one accident. That accident was a little girl had some toilet-training accidents, and because of those accidents, her father beat her to death over the course of a day.

I would ask you to — when we come back on closing arguments to return the only verdict that is consistent with what you will have heard and that's consistent with the law as you will be instructed by [the] Judge . . . a verdict of guilty on both counts.

Molina made no objection to the State's opening statement.

### (b) Standard of Review

■ Plain error will be noted only where an error is evident from the record, prejudicially affects a substantial right of a litigant, and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. See *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *cert. denied* 543 U.S. 1128, 125 S. Ct. 1088, 160 L. Ed. 2d 1081 (2005).

### (c) Analysis

■ As previously noted, Molina did not object to the State's opening statement, either during the statement or immediately

after. Cf. *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998) (in order to preserve, as ground of appeal, opponent's misconduct during closing argument, aggrieved party must have objected to improper remarks no later than at conclusion of argument). In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as the trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *Mata, supra.* Thus, we review this issue for plain error. See *id.*

 We find no such plain error or, indeed, any error at all with respect to the issue Molina raises. One is allowed considerable latitude in making an opening statement. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). The State's opening statement, as summarized above, consisted of an appropriate and accurate summary of the evidence the State would adduce at trial. If Molina was compelled, as a matter of trial strategy, to take the stand in his own defense, it was a result of the evidence adduced by the State, and not the opening statement that described what the evidence would be.

The district court did not commit plain error or, indeed, any error, in permitting the State's opening statement. Molina's assignment of error is without merit.

### 7. INEFFECTIVE ASSISTANCE OF COUNSEL

#### (a) *Massaro v. United States*

 Under Nebraska law, in order to raise the issue of ineffective assistance of trial counsel where appellate counsel is different from trial counsel, a defendant must raise on direct appeal any issue of ineffective assistance of trial counsel which is known to the defendant or is apparent from the record, or the issue will be procedurally barred on postconviction review. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005), *cert. denied* 546 U.S. 947, 126 S. Ct. 449, 163 L. Ed. 2d 341. Molina argues that this rule should be overruled and replaced with the discretionary rule of *Massaro v. United States*, 538 U.S. 500, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003).

Initially, we note that this case is a direct appeal from Molina's convictions and sentences, not a postconviction action in which an issue not raised on direct appeal may be procedurally barred.

While the issue of a procedural bar might be presented in a post-conviction action filed by Molina, in the present case, any discussion would be entirely academic, and it is not the function of an appellate court to render advisory opinions. See *State v. Rust*, 223 Neb. 150, 388 N.W.2d 483 (1986).

Furthermore, we recently rejected an identical argument in *State v. Marshall*, 269 Neb. 56, 61-62, 690 N.W.2d 593, 600-01 (2005), stating:

> We begin by addressing [the defendant's] argument that *Massaro v. United States*, 538 U.S. 500, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003), eliminates any procedural bar resulting from the failure of appellate counsel to raise claims of ineffective assistance of trial counsel on direct appeal. *Massaro* was a federal postconviction proceeding brought pursuant to 28 U.S.C. § 2255 (1994) in which the prisoner alleged ineffective assistance of trial counsel. A federal appeals court had affirmed the dismissal of the action on the ground of procedural default, due to the fact that Massaro was represented on direct appeal by new counsel who did not raise the issue of ineffective assistance of trial counsel. The Court acknowledged the general federal rule that "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice," noting that this "procedural-default rule is neither a statutory nor a constitutional requirement," but, rather, "a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." 538 U.S. at 504. Resolving a conflict among the federal courts of appeals, the U.S. Supreme Court held that "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." 538 U.S. at 509.
>
> The *Massaro* Court noted that a "growing majority" of state courts follow the rule adopted by its holding. 538 U.S. at 508. This court, however, has not adopted the rule. We do not interpret *Massaro* as requiring that we do so, inasmuch as the Court specifically acknowledged that procedural default rules are not constitutional requirements. The general

procedural default rule we have long applied in postconviction proceedings under Neb. Rev. Stat. §§ 29-3001 to 29-3004 (Reissue 1995) holds that a motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal. *State v. Perry*, 268 Neb. 179, 681 N.W.2d 729 (2004); *State v. Lotter*, 266 Neb. 245, 664 N.W.2d 892 (2003). Thus, a motion for postconviction relief asserting ineffective assistance of trial counsel is procedurally barred where a defendant was represented by a different attorney on direct appeal than at trial and the alleged deficiencies in trial counsel's performance were known or apparent from the record. *State v. Al-Zubaidy*, 263 Neb. 595, 641 N.W.2d 362 (2002); *State v. Suggs*, 259 Neb. 733, 613 N.W.2d 8 (2000); *State v. Williams*, 259 Neb. 234, 609 N.W.2d 313 (2000).

The rule we reaffirmed in *Marshall, supra*, is not simply a matter of policy, but grounded in the Nebraska Postconviction Act. Neb. Rev. Stat. § 29-3003 (Reissue 1995) provides in part that "[t]he remedy provided by sections 29-3001 to 29-3004 is cumulative and is not intended to be concurrent with any other remedy existing in the courts of this state." The phrase "any other remedy" encompasses a direct appeal when the issue raised in the postconviction proceeding can be raised in the direct appeal. See *State v. Williams*, 181 Neb. 692, 150 N.W.2d 260 (1967). From that principle is derived the rule that a motion for postconviction relief cannot be used as a substitute for an appeal or to secure a further review of issues already litigated on direct appeal or which were known to the defendant and counsel at the time of the trial and which were capable of being raised, but were not raised, in the defendant's direct appeal. See *State v. Whitmore*, 238 Neb. 125, 469 N.W.2d 527 (1991).

Thus, we stated in *Whitmore, supra*, that the purpose of affording postconviction relief is not to permit the defendant endless appeals on matters already decided. Rather, the purpose is to correct errors of constitutional proportion which could not otherwise be raised on direct appeal, such as ineffectiveness of counsel who brought the direct appeal. *Id.* We concluded that this principle applied where new appellate counsel could have raised the ineffectiveness of trial counsel.

In short, our recent rejection of the *Massaro* standard is not simply a policy determination made by this court, but the consequence of well-established reasoning based in the language of the Nebraska Postconviction Act. In any event, the question of which issues might be procedurally barred in a postconviction action is not before us in the present proceeding. We decline Molina's invitation to reconsider our decision in *State v. Marshall*, 269 Neb. 56, 690 N.W.2d 593 (2005).

### (b) Ineffective Assistance of Trial Counsel

Molina argues that trial counsel provided ineffective assistance of counsel at trial.

#### *(i) Standard of Review*

With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Canbaz*, 270 Neb. 559, 705 N.W.2d 221 (2005).

#### *(ii) Analysis*

To prevail on a claim of ineffective assistance of counsel under *Strickland, supra*, the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Rieger*, 270 Neb. 904, 708 N.W.2d 630 (2006).

But in his supplemental appellate brief, Molina concedes that the record is insufficient to evaluate the ineffective assistance of counsel at trial. Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. When the issue has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. Brown*, 268 Neb. 943, 689 N.W.2d 347 (2004).

At oral argument, the State conceded that where the appellant makes an allegation of ineffective assistance of counsel, even where the record is insufficient to review the issue, "you've

preserved the issue for postconviction." The State specifically conceded that would be the case even under the unique circumstances here, where new counsel was appointed after an appellate brief was filed through trial counsel.

But because, as Molina concedes, the record is insufficient in this appeal to resolve the issue of ineffective assistance of counsel at trial, we reject Molina's eighth assignment of error.

### (c) Ineffective Assistance of Counsel on Direct Appeal

Molina also contends that prior to withdrawal, trial counsel provided him with ineffective assistance of counsel in his brief on direct appeal.

### (i) Standard of Review

With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland, supra,* an appellate court reviews such legal determinations independently of the lower court's decision. *Canbaz, supra.*

### (ii) Analysis

With respect to ineffective assistance of trial counsel on direct appeal, Molina again concedes that in most respects, the record is not sufficient to evaluate counsel's performance, or whether Molina was prejudiced by that performance. We do not consider the issue in those respects. However, Molina argues that the record is sufficient in one respect: Molina argues that trial counsel was ineffective in continuing to represent Molina, by filing a reply brief, after he was aware that Molina had completed an affidavit averring that he wished to pursue the issue of ineffective assistance of counsel.

Molina's argument is somewhat difficult to follow. Molina seems to be arguing that trial counsel should have presented Molina's affidavit to the district court so that new counsel could be appointed. But, obviously, trial counsel did withdraw from representing Molina, and new counsel was appointed. No prejudice resulted to Molina.

Molina also argues that a hearing could have been held in the district court regarding trial counsel's alleged ineffective assistance. Molina claims that

> [u]nder these procedures, evidence would have been pre-
> sented and the district court could make factual findings
> regarding whether [trial counsel] was or was not ineffec-
> tive. This Court would then have a developed factual record
> to review. If . . . Molina's motion was without merit, then
> [trial counsel] would be remain [sic] as appellate counsel.

Supplemental brief for appellant at 34. What Molina does not
explain is how, if new counsel were not appointed to represent
Molina, evidence could have been adduced as to the ineffective
assistance of the counsel that would still be representing Molina
at the hearing. Simply stated, Molina cites no authority, and we
are unaware of any authority, for the procedures that Molina
claims should have been followed.

We cannot conclude, on the record before us, that trial coun-
sel was ineffective, or that Molina was prejudiced, because trial
counsel failed to engage in the process that Molina now suggests.
Molina's ninth assignment of error is without merit.

### (d) Evidentiary Hearing on Ineffective
### Assistance of Counsel

Finally, Molina argues that the district court should have held
an evidentiary hearing regarding ineffective assistance of trial
counsel when trial counsel moved to withdraw from representing
Molina on appeal.

### (i) Standard of Review

A trial court's decision to dismiss appointed counsel is
reviewed for an abuse of discretion. See, *State v. McPhail*, 228
Neb. 117, 421 N.W.2d 443 (1988); *State v. El-Tabech*, 225 Neb.
395, 405 N.W.2d 585 (1987).

### (ii) Analysis

Molina relies upon *State v. Sack*, 239 Neb. 690, 477
N.W.2d 921 (1991), in which we stated that once counsel has
been appointed for an indigent accused, the accused must remain
with the appointed counsel unless one of the following condi-
tions is met: (1) The accused knowingly, voluntarily, and intelli-
gently waives the right to counsel and chooses to proceed pro se,
see *McPhail, supra*; (2) appointed counsel is incompetent, in
which case new counsel is to be appointed, see *State v. Clark*,

216 Neb. 49, 342 N.W.2d 366 (1983); or (3) the accused chooses to retain private counsel, see *State v. Neal*, 231 Neb. 415, 436 N.W.2d 514 (1989). Molina argues that prior to replacing his counsel, a hearing should have established which of these conditions was met.

Molina's argument is without merit. First, his argument is tantamount to contending that new counsel should not have been appointed for him at all, when that was precisely what he wanted to occur. Even if the legal basis for appointing new counsel was insufficient, a defendant in a criminal case may not take advantage of an alleged error which the defendant invited the trial court to commit. *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003), *cert. denied* 543 U.S. 1128, 125 S. Ct. 1088, 160 L. Ed. 2d 1081 (2005); *State v. Bruna*, 12 Neb. App. 798, 686 N.W.2d 590 (2004).

Furthermore, we cannot say the trial court abused its discretion when the trial court's discretion was limited by our instructions to it. Specifically, after trial counsel filed a motion to withdraw, this court sustained the motion and directed the trial court to appoint new counsel for Molina. The order of an appellate court is conclusive on the parties, and no judgment or order different from, or in addition to, that directed by the appellate court can be entered by the trial court. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005), *cert. denied* 546 U.S. 947, 126 S. Ct. 449, 163 L. Ed. 2d 341. The district court had no power to do anything except obey our mandate to appoint new counsel, see *id.*, and a hearing on why trial counsel was permitted to withdraw would have been well beyond the scope of our mandate.

Finally, Molina misapprehends the meaning of the word "incompetent" in the context above. Appointed counsel may be removed because of a potential conflict of interest, and such a conflict could, in effect, render a defendant's counsel incompetent to represent the defendant and warrant appointment of new counsel. *Bruna, supra*. Molina's desire to argue that trial counsel was ineffective gave rise to a potential conflict of interest, because it placed trial counsel in the position of having to argue his own ineffectiveness. See, e.g., *U.S. v. Del Muro*, 87 F.3d 1078 (9th Cir. 1996); *Sullivan v. U.S.*, 721 A.2d 936 (D.C. 1998); *People v. Parker*, 288 Ill. App. 3d 417, 680 N.E.2d 505,

223 Ill. Dec. 772 (1997). Thus, the record does provide a legal basis, pursuant to *State v. Sack*, 239 Neb. 690, 477 N.W.2d 921 (1991), for appointing replacement counsel to represent Molina.

The district court did not abuse its discretion in appointing new counsel for Molina without an evidentiary hearing on ineffective assistance of counsel. Molina's final assignment of error is without merit.

## IV. CONCLUSION

We decline to consider Molina's allegations of ineffective assistance of counsel for which the record is insufficient, and we find no merit to Molina's other assignments of error. The judgment of the district court is affirmed.

AFFIRMED.

WRIGHT, J., not participating.